Albert W. BARBER, III, Appellant

v.

Elizabeth D. BRADLEY, Appellee

2014–SC–000424–DG

Supreme Court of Kentucky.

DECEMBER 15, 2016

COUNSEL FOR APPELLANT: William L. Wilson, Jr., Wilson, Hutchinson, Poteat & Littlepage, Bethany A. Breetz, Stites & Harbison, PLLC

COUNSEL FOR APPELLEE: Steven Russell Dowell, Jackson–Dowell, PLLC

OPINION OF THE COURT BY · JUSTICE HUGHES

In 2010, the Daviess Circuit Court dissolved the marriage of Albert W. Barber, III and Elizabeth Barber (now Elizabeth D. Bradley), and awarded Bradley child support, reserving several other issues including maintenance and property division for later disposition. After those · issues were decided in 2012, Barber appealed to the Court of Appeals, which rejected Barber's allegations of error and affirmed the trial court's judgment in its entirety. Subsequently, Barber sought, and this Court granted, discretionary review as to two issues. Barber contends that the trial court erred 1) by finding that the equity in the parties' residence was · marital property and 2) by concluding that all the household goods and furnishings were marital property and ordering the division of those items by lot. After careful consideration of the record, we conclude that the trial court did not abuse its discretion in determining that the equity in the residence was marital property. However, the designation of all household goods and furnishings as marital property and the order to divide those items by a random drawing was an abuse of the trial court's discretion. Accordingly, we affirm in part, reverse in part, and remand for further proceedings consistent with this opinion.

## FACTUAL AND PROCEDURAL BACKGROUND

Albert W. Barber, III and Elizabeth D. Bradley were married in August 2004. At the time of their wedding, Barber, 35, and Bradley, 34, were both practicing attorneys. After their wedding, the couple and Bradley's daughter from a prior relationship, moved into Barber's residence on Greenacre Drive in Owensboro, Kentucky. During their time on Greenacre Drive, Bradley gave birth to a second daughter.

After living at Greenacre for approximately two years, Barber and Bradley decided to buy a new house, but ultimately opted to build so as to tailor the design of a new home to fit their needs. Those needs included accommodating Bradley's partial disability due to injuries sustained in a 2002 snowmobile accident.

While planning the construction of the new marital home, Barber met with his parents Albert Barber, Jr., and Teena Barber. Barber's parents (who were divorced) decided to give their son money to enable him to build a larger home, but still have mortgage payments equivalent to what the younger couple could afford given their combined income. Barber received $100,000 from his father and $146,000 from his mother to finance the construction of the new home. The funds were given to Barber in the form of checks, each made out to Barber individually. Additionally, on the memo line of their respective checks, Barber's parents indicated that the funds were gifts or advancements on Barber's inheritance. The checks were deposited by Barber into a personal bank account, to which Bradley did not have access. Barber would later use those separate funds to pay the home builder.

Subsequently, Barber and Bradley jointly participated in the planning of the construction of the house which began in 2007. Prior to the start of the construction, Bradley expressed concern to Barber that she wanted to make sure that the home would be "half hers." She did not want to use the money from Barber's parents, preferring to build a smaller house with their own funds. The parties discussed this on several occasions, according to Bradley, with Bradley eventually telling Barber she would not live in a house that was not "half hers." According to Bradley, Barber reassured her that her name would be listed on the deed and that the house would be half hers. Accordingly, the new house was deeded jointly with the right of survivorship. The construction of the new marital residence was completed in 2008, with a total cost of $547,000. As this amount exceeded the funds transferred to Barber by his parents, the couple obtained a first and second mortgage to finance the new home. Barber and Bradley's names were each listed on the mortgages. According to Bradley, Barber agreed the house would be "half hers" in order to secure her agreement to go forward with construction and live in the house.

In May 2010, Bradley filed a petition to dissolve the marriage. Among the issues to be adjudicated by the trial court were the ownership of the marital home and the disposition of the couple's property. In July 2012, the trial court conducted a bench trial on these and other outstanding issues in the divorce.

With regard to the marital home, the parties stipulated that based on the most recent appraisal the value of the house was $480,000, a significant reduction from the total construction cost of $547,000. Additionally, after deducting the outstanding first and second mortgages, the total equity in the home was approximately $140,000.

At trial, Barber claimed that the $246,000 that he received from his parents to help pay for the marital residence was a gift made exclusively to him and therefore nonmarital property. As such, he maintained that he was entitled to the return of the $246,000 prior to the division of the marital portion of the property. In support of this argument, Barber's parents testified that their respective gifts were intended for the exclusive use of their son. Further, Barber's father, who is also an attorney, recalled that he handwrote a letter dated October 17, 2007, stating his

intent that his monetary gifts were to his son and his son alone.

Bradley countered that the residence was marital property and the equity should be divided equally. In her testimony, Bradley recounted her unwillingness to use Barber's parents' money for the marital home and that eventually Barber had assured her that she would be the owner of half the house. Additionally, Bradley argued that her name being on the deed to the house, along with Barber's, demonstrated their joint ownership.

In its order, the trial court noted that Barber disputed Bradley's version of events and that he denied ever assuring Bradley of her co-ownership of the residence. However, the trial court believed Bradley's testimony and also that Barber's claims were contradicted by Bradley's name appearing with his on the deed. Accordingly, the trial court concluded that the residence was marital property and that Barber and Bradley were each entitled to one-half of the home's equity.

Also in dispute at trial was the disposition of the couple's furniture, household goods, and personal property. Prior to trial, Bradley created a list of household property to be appraised ("appraisal list"). The appraisal list documented 185 separate pieces of property, their location, and details regarding their purchase, where possible. While the list included the bulk of the couple's personal property, it did not distinguish between marital and nonmarital property.

A second list entitled "household property in dispute" ("disputed property list") was used by Barber and Bradley during the trial. This list contained approximately 120 separate pieces of property and their location at the time of trial. The lower number of items listed on the disputed property list was due to the agreement of the parties regarding the ownership of a substantial portion of the property itemized on the appraisal list. The parties also agreed as to the ownership of a number of items on the disputed property list. As such, prior to trial the ownership of a considerable portion of the couple's property was no longer in dispute.

Despite this agreement, the trial court in its ruling noted that there were several lists of personal property and household goods to be divided. The several lists the trial court was referring to were the appraisal list, the disputed property list, and Bradley's final disclosure statement. Subsequently, the trial court concluded that it was "provided with insufficient information to make a meaningful and accurate designation and division of the property on those lists." As such, the trial court authorized a process to divide the personal property by lot.

The trial court ordered that a copy of the disputed property list be cut into individual strips, with each slip identifying a single piece of personal property. Additionally, the parties were ordered to repeat the process for all other items of personal property identified in the other lists submitted by the parties (with the exception of vehicles and jewelry). Each of these strips of paper was to be folded and placed into a box. Thereafter, the winner of a coin toss would blindly select a slip from the box. The parties would then alternate until all of the property had been selected. The trial court did acknowledge that if the parties were able to identify and reach an agreement regarding a different method of dividing the property that they would be permitted to do so.

Thereafter, Barber appealed the judgment of the trial court to the Court of Appeals, which affirmed the ruling of the trial court. The Court of Appeals determined that the disposition of the personal

assets of the couple through the aforementioned random drawing process was a division of property in just proportions pursuant to Kentucky Revised Statute (KRS) 403.190. Additionally, the Court of Appeals agreed with the trial court as to the residence, although it stated its conclusion differently. The appellate court held that Barber "gifted the $247,000 to Bradley or otherwise merged it with the marital estate."[1]

## ANALYSIS

■ As this is an appeal from a bench trial, our standard of review is set forth in Kentucky Rule of Civil Procedure (CR) 52.01. Under CR 52.01, the trial court is required to make specific findings of fact and state separately its conclusions of law relied upon to render the court's judgment. Further, those "[f]indings of fact, shall not be set aside unless clearly erroneous, and due regard shall be given to the opportunity of the trial court to judge the credibility of the witnesses." CR 52.01. In fact, "judging the credibility of witnesses and weighing evidence are tasks within the exclusive province *of the trial court.*" *Vinson v. Sorrell,* 136 S.W.3d 465, 470 (Ky. 2004) (quoting *Moore v. Asente,* 110 S.W.3d 336, 354 (Ky. 2003)).

■ "If the trial judge's findings of fact in the underlying action are not clearly erroneous, *i.e.,* are supported by substantial evidence, then the appellate court's role is confined to determining whether those facts support the trial judge's legal conclusion." *Commonwealth v. Deloney,* 20 S.W.3d 471, 473–74 (Ky. 2000). However, while deferential to the lower court's factual findings, appellate review of legal determinations and conclusions from a bench

trial is *de novo. Sawyers v. Better,* 384 S.W.3d 107, 110 (Ky. 2012).

## I. The Trial Court Properly Classified the Residence as Marital Property.

### A. The $246,000 Was a Gift From Barber's Parents Solely to Their Son and Therefore Nonmarital Property.

Barber first alleges that the trial court erred in determining that the $140,000 equity in the residence is marital property. Rather, he claims the whole of the equity in the residence based on the aforementioned checks given to him by his parents which helped finance the home's construction.

■ The disposition of property in a dissolution of marriage action is governed by KRS 403.190. Under KRS 403.190(1) the trial court is instructed to characterize each item of property as either marital or nonmarital. When evaluating whether property is marital or nonmarital the record title is not controlling or determinative, but is evidence to be considered by the trial court. *Sexton v. Sexton,* 125 S.W.3d 258, 264 (Ky. 2004) (citing KRS 403.190(3)). Rather than relying solely on how property is titled, "Kentucky courts have typically applied the 'source of funds' rule to characterize property or to determine parties' nonmarital and marital interests in such property." *Id.* at 265 (quoting *Travis v. Travis,* 59 S.W.3d 904 (Ky. 2001)).

After characterizing the couple's property as marital or nonmarital, the trial court then assigns the nonmarital property to its determined owner, while the marital property is to be equitably divided between the couple. It is presumed that all property acquired during the marriage is marital

---

**1.** While the evidence at trial demonstrated that Barber received a total of $246,000 from his parents, the trial court's order erroneously listed that amount as $247,000. The opinion of the Court of Appeals also used the $247,000 figure.

unless it falls under one of the five enumerated exceptions set forth in KRS 403.190(2). One exception recognized in KRS 403.190(2)(a) is property acquired by gift, i.e., either spouse can establish that a particular asset or funds were a nonmarital gift made to him or her individually during the marriage.

■ A party claiming a specific item of property is nonmarital can rebut the "marital property presumption" through clear and convincing evidence. *Sexton*, 125 S.W.3d at 266 n.23. "Clear and convincing proof does not necessarily mean uncontradicted proof. It is sufficient if there is a proof of a probative and substantial nature carrying the weight of evidence sufficient to convince ordinarily prudent-minded people." *Rowland v. Holt*, 253 Ky. 718, 70 S.W.2d 5, 9 (1934).

■ To evaluate whether a transfer is a gift to a spouse individually and therefore that spouse's nonmarital property, the trial court is to employ the four-factor test set forth in *O'Neill v. O'Neill*, 600 S.W.2d 493 (Ky. App. 1980). The *O'Neill* factors are: (1) "the source of the money with which the 'gift' was purchased," (2) "the intent of the donor at the time as to intended use of the property," (3) "status of the marriage relationship at the time of the transfer," and (4) "whether there was any valid agreement that the transferred property was to be excluded from the marital property." *Id.* at 495. These factors are phrased in somewhat confusing language because the issue in *O'Neill* was an alleged gift from husband to wife, *i.e.*, whether expensive jewelry presented by the husband to the wife on her birthday, Christmas, and other occasions, was a gift and therefore her nonmarital property. The appellate court concluded that the trial court erred in finding the jewelry to be nonmarital because the husband paid for it with marital funds, the parties intended to sell it in

the future if necessary to finance their children's education and there was no evidence that they agreed the jewelry was to be excluded from the marital estate and treated as her separate property. In *Sexton*, the Court adopted the *O'Neill* test and added a fifth factor for when the gift (as in this case) is from a third party; "whether the purported donor received compensation for the transfer." 125 S.W.3d at 268. The *Sexton* Court, further emphasized that the donor's intent was the primary factor in determining whether a transfer of property is a gift and if that gift is made jointly to spouses or individually to one spouse. *Id.* at 268–269.

■ Although the asset at issue is the residence, and more specifically the equity in that house, we begin our analysis with the checks on which Barber bases his nonmarital claim to that asset and whether those checks received during the marriage were a nonmarital asset. We conclude they were nonmarital.

There is no dispute that Barber received approximately $246,000 in cash from his parents to partially finance the construction of the couple's residence. Barber's parents testified that their $246,000 transfer to Barber was an advance on his inheritance. According to Barber's father, the money would permit Barber to build a larger home, but still have mortgage payments equivalent to what the couple could afford given their combined income. While the funds were designed to benefit both Barber and Bradley by enabling the construction of a larger marital home, Barber's parents insisted that the funds were given solely to their son. Barber's father testified that he wrote the check only to his son and prepared a letter contemporaneous with the transfer signaling his intent to advance inheritance funds to his son to finance the construction of the residence. Additionally, these funds were placed into

Barber's individual bank account to which Bradley did not have access. These facts weigh heavily in favor of the transfer being a nonmarital gift. Barber's parents used their own funds to make gifts to him that were intended solely for him and the parents received nothing in return. Thus three of the five factors point decisively to a nonmarital gift. The other two factors (state of the marriage and an agreement that the property would be separate, nonmarital property) are not really relevant here because the alleged gift was from a third party as opposed to a gift between the spouses themselves as in *O'Neill.*

Having reviewed the record and the application of the *O'Neill* and *Sexton* factors, we agree with Barber and the trial court that the monetary transfers made by Barber's parents were gifts made solely to him. Therefore, the $246,000 transfer from Barber's parents to their son during the parties' marriage was nonmarital property. That, of course, is only the initial step in our analysis.

**B. There is Substantial Evidence to Support the Trial Court's Conclusion that the Equity in the Residence is Marital Property.**

■ After finding that the $246,000 transfer from Barber's parents to their son was a gift solely to him, the trial court focused on Barber's subsequent actions to conclude that the equity in the residence is marital property. After receiving the monetary gift from his parents, Barber used those funds to partially finance the construction of the marital residence. The trial court found that prior to the construction of the marital home Barber made promises to Bradley regarding her joint ownership. In the court's view, these promises were

eventually evidenced in the joint deeding of the marital home to both Barber and Bradley. The trial court concluded that due to Barber's representations and promises the equity in the residence was their marital property and therefore subject to a marital division.

Barber alleges that it was error for the trial court to go beyond tracing the $246,000 gift back to Barber's parents and contends that the trial court's judgment resulted in the adoption of the doctrine of transmutation, a legal doctrine expressly rejected by the Court in *Sexton.* Barber's concern about the lower court's supposed adoption of the doctrine of transmutation is misplaced as the trial court's determination was based on existing principles of gift law rather than transmutation.

In *Sexton,* prior to the marriage the husband owned an eight-unit apartment building, with a mortgage debt equal to approximately half of the property's assessed value. 125 S.W.3d at 261. During their marriage, the Sextons conveyed the apartment building to a partnership, Autumn Park Partnership, operated by the husband's parents in exchange for a one-sixth partnership interest that was placed in the couple's names.[2] *Id.* Additionally, the husband individually executed a note payable to his parents, representing the balance of the debt against the apartment building. *Id.* Over the next few years, the husband's parents forgave the note's balance as a gift to the husband. Additionally, the husband's father managed the partnership and the apartment building without any substantial assistance from the Sextons, *Id.*

When the Sextons divorced, the trial court concluded that the husband had a 94% nonmarital interest in the one-sixth

**2.** The wife's participation in the conveyance was necessary to release her dower interest in the property.

partnership interest in Autumn Park. *Id.* at 262. The wife appealed this ruling alleging that she was entitled to one-half of the couple's partnership interest. *Id.* at 263. The wife's first claim was that general partnership law required that she be awarded her interest in the property given that the one-sixth interest was held in both names. *Id.* at 264. The Court disagreed, recognizing that record title or the form in which the property was held was not determinative as to its classification and focusing instead on the source of the funds to determine the character of the property. *Id.* The Court also rejected the wife's claim that there was insufficient evidence to trace the husband's nonmarital interest in the property. *Id.* at 267. Similarly, the Court found that there was sufficient proof that the debt forgiveness on the note individually signed by the husband was a gift solely to him. *Id.* at 269.

The wife in *Sexton* also claimed that the act of placing the property in the couple's joint names had the legal effect of transmuting the property into marital property. As the Court explained, "[Transmutation] occurs when separate property is treated in such a way as to give evidence of an intention that it become marital property. One method of causing transmutation is to purchase property with separate funds but to take title in joint tenancy." 125 S.W.3d at 270 (quoting H. Clark, *The Law of Domestic Relations in the United States* § 16.2 at 185 (1987)). The Court declined to adopt the doctrine of transmutation determining it to be inconsistent " 'with Kentucky's property division statute, which makes title irrelevant in determining property's character[,]' with the principles of tracing established by Kentucky case law, and with Kentucky's source of funds rule." *Id.* at 271 (citations omitted). In declining to adopt the doctrine of transmutation and rejecting the other arguments raised by the wife, the Court affirmed the trial court's disposition of the one-sixth partnership interest in Autumn Park. *Id.* at 273.

▪ The *Sexton* Court's rejection of the doctrine of transmutation was proper as it would have been inconsistent with Kentucky's property division statute. As such, we reaffirm the conclusion reached by the *Sexton* Court that the act of placing property in a couple's joint names does not in and of itself transmute that property into marital property. However, this conclusion regarding the doctrine of transmutation does not resolve the case at bar. In determining that the equity in the residence occupied by the Barbers during their marriage was marital property, the trial court did not base its determination solely on title. Rather, the trial court examined Barber's own actions before determining that the equity in the residence was marital property. Before turning to the *O'Neill* factors to ascertain whether Barber gifted his nonmarital interest in the $246,000 from his parents either to Bradley or their marital estate, the following passage from the leading Kentucky family law treatise deserves note:

Kentucky law appears to permit property's "transmutation" by gift, though not by use. Perhaps it is confusing to use the term transmutation. A preferable way to explain the cases is to say that one of the parties may gift his or her nonmarital property to the other. A gift implies a particular intention on the part of a donor, while transmutation does not necessarily result intentionally. Most recently, in *Murray v. Murray*, 2015 WL 136315 (Ky. Ct. App. 2015), a wife testified that the husband's deed to her of a one-half interest in real estate he owned at the date of the marriage stemmed from her condition (and his apparent agreement) that she would marry him and move into his house only if she were

given an undivided one-half interest in the house.

If property that is "gifted" is marital, trial courts retain discretion to award that property to one or the other of the parties, depending on all the circumstances of the case.

Louise Graham & James Keller, 15 Ky. Prac. Domestic Relations Law § 15:14 n.3 (2016).

In assessing whether the trial court was correct in concluding that Barber made a gift of his nonmarital monies for construction of the family home, we refer back to the four-factor *O'Neill* test. As to the first factor, "the source of the money with which the 'gift' was purchased," it was previously established that Barber used the $246,000 gift/advance on his inheritance that he received from his parents to partially finance the construction of the residence. This was nonmarital money.

As for the second factor, "the intent of the donor at the time as to intended use of the property," the record supports the conclusion that Barber then used his personal funds to construct the house with the intent that the home would be a marital asset that the couple owned jointly. Before using the funds provided by his parents to partially finance the construction of their home, Barber repeatedly made assurances to Bradley regarding her co-ownership of the property. Bradley testified that on multiple occasions, Barber assured her that the house would be "half hers."[3] To confirm this agreement, Barber executed a deed which conveyed the property to himself and Bradley as joint tenants with right of survivorship. Barber disputed Bradley's testimony denying that he had ever assured her of ownership of the residence.

However, the trial court discounted Barber's account, and concluded that Bradley's testimony, along with the deed, was sufficient to demonstrate that Barber intended for Bradley to own one-half of the house. The decision of the trial court to believe Bradley's testimony over that of Barber was proper as the trial court was in the best position to assess the credibility of the witnesses' testimony and it had the choice to believe or disbelieve any portion of their testimonies. *Vinson*, 136 S.W.3d at 470.

The third factor, the "status of the marriage relationship at the time of the transfer," supports the finding that Barber made a gift of his nonmarital funds for the construction of the residence. The transfer occurred early in the couple's marriage and there was no evidence presented that the parties' marriage was in trouble during that period.

The final factor, "whether there was any valid agreement that the transferred property was to be excluded from the marital property," supports that the transfer was indeed a gift. Not only was there no agreement that Barber's $246,000 contribution to the $547,000 home would remain nonmarital property, the trial court heard substantial proof to the contrary, specifically Bradley's testimony regarding Barber's intent to make the residence "half his and half hers."

■ The dissent suggests that if Barber made a gift of his nonmarital interest to Bradley then that interest would become her nonmarital property and should be assigned to her before the remaining marital value of the residence, if any, was distributed. That clearly was not what

---

**3.** Bradley testified there were several conversations before she relented and agreed to use the funds on the condition that the home they constructed would be "half hers." She detailed two of those conversations, one in the kitchen of their prior home on Greenacre and one in the driveway of that house.

Bradley contended that her former husband had done nor what the trial court or Court of Appeals concluded. Bradley consistently maintained that her former husband repeatedly assured her that the house they were constructing would be half his and half hers, in essence he was relinquishing or "gifting" any nonmarital claim he had so that the house acquired during their marriage would be a purely marital asset. Several jurisdictions recognize that a spouse can make a gift of nonmarital property to the marital estate. See, e.g., *Prizzia v. Prizzia,* 58 Va.App. 137, 707 S.E.2d 461 (2011); *Burnside v. Burnside,* 194 W.Va. 263, 460 S.E.2d 264 (1995); *Eldridge v. Eldridge,* 137 S.W.3d 1 (Tenn. Ct. App. 2002). While some of these jurisdictions may be more accepting of the doctrine of transmutation based solely on title than Kentucky is, others require evidence of a gift having been made to the marital estate, i.e., something beyond title held jointly. *See, e.g., Prizzia,* 707 S.E.2d at 473–74. Regardless, we conclude that during marriage either spouse may "gift" his or her nonmarital funds to the parties' marital estate including by expending those funds, as here, on the marital home with express representations to the other spouse that the home will be their joint, marital property.

In sum, the source of Barber's claimed non-marital interest in the house was the $246,000 gift from his parents that was his nonmarital property, but Barber's subsequent actions resulted in a different outcome when it was time to divide the parties' property. By repeatedly promising

Bradley that the house was "half hers" and executing a deed that reflected that agreement, Barber transferred his nonmarital interest in the home to the marital estate as a gift. Therefore, we agree with the circuit court's conclusion that the equity in the home was marital property, and we further find no error in the court's conclusion that Barber and Bradley each are entitled to a one-half share.[4]

### III. The Trial Court Erred in its Characterization of the Couple's Personal Property and Direction for Division of That Property.

Barber alleges that the trial court erred by failing to: (1) award undisputedly nonmarital items to the appropriate party; (2) make factual findings and legal conclusions regarding the marital or nonmarital nature of the disputed items; and (3) determine an appropriate mechanism to divide marital property. We agree with these allegations of error.

To divide personal property in a divorce, the trial court is obligated to follow the procedure set forth in KRS 403.190. As the first step in this process, the trial court is required to assign undisputed nonmarital property to its determined owner. Prior to trial, Bradley submitted the appraisal list identifying the personal property of the couple in dispute. Subsequently, the parties employed an alternate list, the disputed property list, during trial. Certain items that were on the appraisal list were left off the disputed property list, due to an agree-

---

**4.** Barber concludes his argument by alleging that if the Court were to rule against him, that the outcome will undermine trust in marriages. Specifically, Barber suggests that spouses with a nonmarital interest in a residence will need to exercise caution when making decisions regarding the deed, home design, property upkeep, or home improvement to avoid a similar result. This concern expressed by Barber is misplaced. If a representation is repeatedly made to a spouse about their co-ownership of property and that promise is formalized in a writing, both parties should has occurred. In doing so, rather than undermining the marriage relationship, the courts can guard against a spouse taking advantage of the trust of his or her partner based on false representation.

ment between the parties regarding their ownership. The parties also agreed that several items initially included on the disputed property list were the undisputed property of either Barber or Bradley.

However, the trial court determined that it had insufficient information by which to make a division of the personal property of the couple and ordered the division of all personal property identified by the parties by lot. In doing so, the trial court failed to properly assign undisputed nonmarital property to its owner. This was error. On remand the trial court must assign undisputed personal property to its proper owner.

■ Barber also argues that the trial court erred in failing to rule on the marital or nonmarital nature of items which were in dispute. Specifically, Barber alleges that there was sufficient evidence presented to demonstrate his nonmarital interest in several disputed items. In its order the trial court concluded that it had insufficient information by which to make a meaningful and accurate designation and division of the property identified by the parties. We acknowledge that the case at bar was not an easy matter to adjudicate due to its contentious nature. However, the trial court should have issued detailed findings of fact regarding the ownership of the disputed property. On remand, the trial court is directed to review the record and make findings regarding whether Barber or Bradley provided sufficient evidence to overcome the marital property presumption as to each item of disputed property.

■ Barber also argues that a random draw was an inappropriate mechanism to divide the couple's marital property and remaining disputed property.[5] In dividing a couple's marital property the trial court is to consider all relevant factors including those factors specifically enumerated under KRS 403.190(1).[6] The purpose of considering those four factors is to ensure a just division of the marital property of the couple.

In the case at bar, absent an agreement to the contrary, the mechanism devised by the trial court to divide the couple's mari-

**5.** Bradley further argues that as the random draw has not yet occurred Barber's claim is not ripe for adjudication. We disagree. "The basic rationale of the ripeness requirement is 'to prevent the courts, through the avoidance of premature adjudication, from entangling themselves in abstract disagreements[.]' " *W.B. v. Commonwealth, Cabinet for Health and Family Services*, 388 S.W.3d 108, 114 (Ky. 2012) (quoting *Abbott Labs. v. Gardner*, 387 U.S. 136, 148, 87 S.Ct. 1507, 18 L.Ed.2d 681 (1967) (*abrogated on other grounds* by *Califano v. Sanders*, 430 U.S. 99, 97 S.Ct. 980, 51 L.Ed.2d 192 (1977). In the case at bar, the trial court ordered the couple's property to be divided by lot. That determination was part of a final and appealable order issued by the trial court. Absent Barber's appeal of the trial court's order the random lot drawing would have already occurred. As such, this issue is properly before the Court to be adjudicated.

**6.** (1) In a proceeding for dissolution of the marriage or for legal separation, or in a pro-

ceeding for disposition of property following dissolution of the marriage by a court which lacked personal jurisdiction over the absent spouse or lacked jurisdiction to dispose of the property, the court shall assign each spouse's property to him. It also shall divide the marital property without regard to marital misconduct in just proportions considering all relevant factors including:

(a) Contribution of each spouse to acquisition of the marital property, including contribution of a spouse as homemaker;
(b) Value of the property set apart to each spouse;
(c) Duration of the marriage; and
(d) Economic circumstances of each spouse when the division of property is to become effective, including the desirability of awarding the family home or the right to live therein for reasonable periods to the spouse having custody of any children.

tal property, a random draw, was an abuse of discretion. As Barber correctly points out, such a system does not take into account the factors identified under KRS 403.190(1)(a)–(d). In particular, a random draw does not differentiate between the value of the property set apart to each spouse. As such, by using a random draw, one spouse could receive relatively inexpensive household goods, while the other spouse could "win" by receiving antiques or other more valuable personal property. Such an outcome, rather than being an assignment of the couple's property based on "just proportions," would be an unacceptable result. As such, we cannot condone the trial court's authorization of a random draw as it could lead to great inequity in the division of property. On remand, the trial court must divide the couple's marital property in a manner that does not run afoul of the requirements of KRS 403.190(1).[7]

## CONCLUSION

For the foregoing reasons, the opinion of the Court of Appeals is affirmed in part and reversed in part and this case is remanded to the circuit court for proceedings consistent with this Opinion.

Minton, C.J.; Cunningham and Keller, JJ., concur. Noble, J., concurring in part and dissenting in part by separate opinion in which Venters, J., joins. Wright, J., concurring in part and dissenting in part by separate opinion.

NOBLE, J., CONCURRING IN PART AND DISSENTING IN PART:

The wife in this case raised a "gift" claim—that her husband gave her a one-

half interest in the marital home. The lower courts found that he did, but either completely misconstrued this argument, or failed to require that she prove this claim by clear and convincing evidence.

First, if the wife was claiming the property as a gift, then she was asking the court to award her half the value of the home as her separate, or nonmarital property. That is how a "gift" must be addressed under Kentucky law. If one half of the marital residence was truly gifted to her, then that half lost any character as marital funds. Also, to claim the property as a gift, the wife would face the same burden the husband had in tracing the gift from his parents that went into building the home as his nonmarital property—she must prove the nature of the gift. To establish his non-marital interest in the property, the husband must prove that his parents gave him money that he spent on building the residence, which in this case is undisputed, and then trace the funds as they were used to pay for the house, *Roberts v. Roberts*, 462 S.W.2d 911 (Ky. 1971), which the majority agrees he did. Likewise, for the wife to show a non-marital interest, she must prove that the husband gave her a one-half undivided interest in the marital residence outright as her nonmarital property, by clear and convincing evidence.

Oddly enough, however, to this point this property has been viewed as marital. As the Court of Appeals termed it, the husband "gifted the $247,000 to Bradley (wife) or otherwise merged it with the marital estate." *If* the husband made the

---

7. Bradley contends that the Court should reject Barber's argument against the imposition of a random draw, due to the trial court's willingness to allow the parties to agree to an alternate mechanism to divide the couple's property. However, this alternative by the tri-

al court is simply that—an alternative that may or may not come to fruition—and it does not cure errors in the assignment of the couple's property nor does it ensure a just division of the marital assets.

gift, it is the wife's separate, non-marital property, not marital property to be divided. And if there was a gift, and this was the wife's nonmarital property by gift, then the marital estate was improperly divided. The wife at that point would have owned half the residence the parties had lived in as her separate property. She and the husband together would have owned the other half. Only that half, the marital property, could be divided by the court, and the husband could make his nonmarital claim against that half. That is, of course, if he fully gave her one half of the marital residence free and clear of any ownership interest he had in that half.

And if the husband "merged" the gift from his parents into the marital estate as the Court of Appeals suggested, this is simply using nonmarital money during a marriage. But if there were such a thing as a "gift to the marital estate," then on divorce the "marital estate" (whatever that is) would still have to prove the gift by clear and convincing evidence when husband raised his nonmarital interest claim.

There is no question that the money from the husband's parents was a nonmarital gift to him. The only question is whether the husband then in turn gave away his non-marital and marital interests up to one half the value of the property when he amended his deed to the property to include his wife's name, in survivorship, and according to her also told her that the house was as much hers as it was his. Additionally, the wife helped design the house, and claims it was designed partly to accommodate injuries she received from a snowmobile accident. There was also a consideration clause in the deed that added the wife's name to the property stating that the transfer was "by gift and without consideration," a common clause in deeds for convenience when no money exchanges hands for the transfer of all or part of the ownership of the property. *See, e.g., Reitmeier v. Reitmeier,* 249 S.W.2d 716, 717 (Ky. 1952) (noting that husband had purchased land with non-marital funds and "had the title placed in himself jointly with [his wife] for convenience only").

This is all the "evidence" of the husband's donative intent by which the wife attempted to prove her husband had made her a gift of one half the value of the marital residence. It must be noted that the burden of proving this gift would be on the wife, and that proof must be sufficient to overcome the presumption that property owned during the marriage is marital. The proof must be "clear and convincing ... that [s]he acquired h[er] interest by gift." *Browning v. Browning,* 551 S.W.2d 823, 825 (Ky. App. 1977); *accord Farmer v. Farmer,* 506 S.W.2d 109, 112 (Ky. 1974) (noting burden is on party seeking to show a gift).

This leaves a clear problem with making the leap that the husband gave one half of the house to the wife. By placing her name on the deed as a joint tenant, she in fact became just as much an owner of the house as the husband—to the whole and not only to half, as long as they were married. And the deed (as well as any alleged comments by the husband) was silent as to the legal non-marital interest the husband *would have* if the parties ever divorced. Indeed, all the deed to the property did at that time was indicate that the husband and wife owned the property *jointly*—the whole property, not one-half and one-half as tenants in common might. And as long as the parties remained married, the husband's non-marital interest could not be asserted upon sale of the property. Such a non-marital interest only ripens when a divorce is intended under KRS Chapter 403. Also, had the husband died while still married to his wife, she would have then had sole ownership of the

whole property by operation of survivorship law.

The law simply recognizes that when couples divorce, the shared interest they had during the marriage is affected by the severing of the marital bonds. Upon divorce, the court should "restore each party as nearly as possible to the condition in which he or she would have been except for the marriage." *Redmon v. United States,* 471 F.2d 687, 689 (6th Cir. 1972); *see also Kivett v. Kivett,* 312 S.W.2d 884, 888 (Ky. 1958) ("It was intended that each party should be returned as nearly as possible to the status or condition in which the party would have been except for the marriage.").

To get to this position, a trial court utilizes a three-step process to divide the parties' property in a divorce: (1) characterize each item of property as marital or non-marital; (2) assign non-marital property to each party; and (3) equitably divide the marital property. *Sexton,* 125 S.W.3d at 264–65. In characterizing property as marital or non-marital, to the extent that gifts have come from one spouse's side of the family or were given specifically to the spouse alone, those gifts are considered separate property of that spouse. (The same is true of gifts between spouses, such as jewelry or other personalty, unless it can be proved that the items were bought for a marital purpose such as investment.) If the gift were a piece of land given to one party, then unless the parties had increased the value of the land due to efforts during the marriage, the whole piece of land would be restored to that spouse under KRS 403.190. When the gift is money, that spouse has to be able to show, or trace (when there are both non-marital and marital interests as here), that the money was spent on acquiring whatever property is at issue. If the money solely paid for the contested property, and if it

has not appreciated in value due to the efforts of the spouses during the marriage, then the entire property is separate property and must be assigned to that spouse.

It is significant that the law that applies upon divorce is clearly different from the law that applies during marriage or on the death of a spouse when it comes to the disposition of property. It is clearly defined and set apart by KRS 403.190 and cases interpreting it. Disposition of property during the marriage and upon the death of a spouse are covered by separate statutory sections.

But this is not to say that the husband *could not* gift to his wife his inchoate nonmarital interest in property owned during the marriage. But if he did, then there must be clear and convincing evidence that he did so.

When is evidence "clear and convincing? It is generally agreed that while most cases require only a "preponderance of the evidence," some issues, such as making a gift of property, require a higher degree of proof than simply being "more probably true than not," which is all that is required to establish a preponderance. Robert G. Lawson, *The Kentucky Evidence Law Handbook* § 9.00, at 517 (3d ed. 1993). That higher standard is usually described as being "clear and convincing evidence." As with most legal standards, our jurisprudence does not allow a specific definition of the term, preferring to let a jury apply its own meaning. However, there is guidance on applying the term.

At the very least, for evidence to be clear and convincing, the trier of fact "must be persuaded that the truth of the contention is 'highly probable.'" *Fitch v. Burns,* 782 S.W.2d 618, 622 (Ky. 1989) (quoting *McCormick on Evidence* § 340(b), at 796 (2d ed. 1972)). But the Court went on to describe the standard in more detail, putting it this way:

We conclude that where the "burden of persuasion" requires proof by clear and convincing evidence, the concept relates more than anything else to an attitude or approach to weighing the evidence, rather than to a legal formula that can be precisely defined in words. Like "proof beyond a reasonable doubt," "proof by clear and convincing evidence" is incapable of a definition any more detailed or precise than the words involved. It suffices to say that this approach requires the party with the burden of proof to produce evidence *substantially more persuasive* than a preponderance of evidence, but not beyond a reasonable doubt.

*Id.* (emphasis added).

This places the clear-and-convincing standard somewhere between the preponderance and beyond-a-reasonable-doubt standards. But if a preponderance of the evidence requires that the trier of fact be persuaded that the contention is more probable than not, then the clear-and-convincing standard requires still more. Instead of more probable than not, the trier of fact must be persuaded that the contention is "highly probable." And the evidence must be "substantially more persuasive" to reach that level.

The evidence in this case upon which the wife bases her claim of owning half the house in which the couple resided is simply not clear and convincing. First, it is not undisputed evidence. The husband denies he ever told his wife that they would own the property "half and half." The other evidence stated in support of wife's position is equally debatable.

That she wanted to build a smaller house while husband wanted a larger one does not prove that he gave her half the house in order to get her to agree to build a larger one. If anything, this seems to indicate that she did not want to feel obligated to his parents, or feared that they would feel entitled to interfere with the property because of their gift which allowed a bigger building. The evidence indicates the wife was only interested in a certain level of mortgage debt. The gift from the parents allowed a larger house without that debt, but this fact does not support that the husband gave her half the larger house.

That the property was conveyed by a survivorship deed to a married couple is nothing but standard practice when a married couple buys a house. Including the wife's name on the deed indicates that she is an owner of the house, by the entirety, the same as the husband. The deed is evidence that as a *married couple,* this properly belongs to then as a couple, completely. The survivorship clause provides for a surviving spouse to own the *entire* property free and clear of other heirs if the spousal death occurred during the marriage. This clearly says little about giving the wife *half* of the property, and it says nothing about property division on divorce, which applies different law.

That the couple argued heatedly about the kind of house they wanted to build and taking a gift from his parents, which may have resulted in husband angrily throwing a pot of green beans in the yard after one such argument, provides no support for a claim that he gave wife half the house. At best, it shows that the couple had a contentious relationship, which is hardly conducive to the giving of such a gift as claimed here.

And even if we take the wife's claim as true that husband said each of them owned half of the house, we are required to speculate that he meant this ambiguous and erroneous statement to be the gifting of half the house to wife.

Indeed, what we have here is not so different from countless cases where a spouse has asserted a non-marital interest in property owned during the marriage when the parties are divorcing and the court is doing property division. In most instances, spouses will have a joint, survivorship deed for real property owned during the marriage. Standing alone, this cannot be reasonably construed as waiving or gifting any non-marital interest either spouse may have on divorce. And when the husband told the wife the house was as much hers as it was his, he stated nothing but the truth—as long as the parties were married under a joint deed. It would have been a false statement to tell her only one half of the house was hers. And if he died while still married to her, she would own more than one half—she would own the whole. The legal reality is that while spouses remain married to each other, personal money or gifts that are invested in the marital home do not give that spouse more of an ownership interest than the other. Such a claim does not spring into existence until a divorce proceeding is begun.

A similar Court of Appeals case, *Fehr v. Fehr*, 284 S.W.3d 149 (Ky. App. 2008), is illustrative. During their marriage, the Fehrs bought a villa in St. Maarten as a second home. Each of them put significant non-marital money into the purchase, although the husband contributed roughly twice as much as the wife did. The villa's value increased significantly during the marriage. Despite the husband's contribution, the trial court awarded the entirety of the villa to the wife.

On review, the Court of Appeals noted that the trial court had failed to follow its mandatory statutory duty to assign non-marital interests to the parties, even though it had found that the husband's contribution to the purchase was not a gift to the wife, as she claimed. Considering the wife's contention that the husband's contribution to the villa was a gift to her, and thus should not be restored to him, the Court of Appeals cited four factors from a landmark case, *O'Neill v. O'Neill*, 600 S.W.2d 493 (Ky. App. 1980), as dispositive of the gift question: "(1) the source of the money; (2) the intent of the donor at the time of the transfer; (3) the status of the marriage relationship at the time of the transfer; and (4) whether there was a valid agreement that the transferred property was to be excluded from the marital property." *Fehr*, 284 S.W.3d at 158 (citing *O'Neill*, 600 S.W.2d at 495). The Court of Appeals found that the fact that the husband used non-marital funds for the purchase as an investment as well as a residence and that his testimony ("most telling," *id.*) that he did not intend his contribution as a gift was substantial support for the trial court's finding that the money was not a gift. The trial court, therefore, erred in not assigning the husband's non-marital interest to him.

The law clearly provides for a "take back" when and if the parties ever divorce, following the source-of-funds rule. *Rearden v. Rearden*, 296 S.W.3d 438, 441–42 (Ky. App. 2009). If husband had indeed given wife one half ownership of the house free and clear of him and his claims, then she was entitled to take her half, leaving only the remaining half as marital property subject to division. The lower courts got it wrong, if the wife individually owned one half of the house, and *she* is the party aggrieved.

The wife's evidence here falls far short of clear and convincing, and at best invites speculation about what the husband was thinking rather than proving his thoughts. At most, the statements she claims he made about the property are ambiguous.

Ambiguous statements cannot be "clear and convincing" proof of any fact.

Also, from another perspective, if a court believes that the equities lie with the spouse that does not have a non-marital interest, equity can be addressed by assigning a larger share of the total marital estate to that spouse, since the law allows the court to consider the amount of nonmarital property a spouse has when making the equitable division of marital property. *Russell v. Russell*, 878 S.W.2d 24, 25 (Ky. App. 1994). Otherwise, under the majority's view, all a divorcing spouse has to do to claim property she is not otherwise entitled to under divorce law is to say, "He gave it to me." That is essentially all that the evidence shows here, and the majority allows an erroneous view of "gift" to circumvent the well-reasoned law of property division on divorce without reaching the clear and convincing standard.

Consequently, I would reverse the Court of Appeals' holding that the husband gifted the wife one half of the marital residential property, and remand this case to the trial court to assign to the husband his nonmarital share of the marital residence. Had there been clear and convincing evidence of a gift of one half the house to the wife, I would reverse the Court of Appeals and remand for the lower court to give her nonmarital interest to her. I concur with the majority on all other issues.

Venters, J., joins.

WRIGHT, J., CONCURRING IN PART AND DISSENTING IN PART:

I join Justice Noble's well-reasoned concurring in part and dissenting in part opinion in most respects. However, I would apply the clear and convincing standard slightly differently on the point of whether the husband had made the wife a gift of the marital residence. In Justice Noble's separate opinion, she states that "the bur-

den of proving this gift would be on the wife." I agree with this statement. But, Justice Noble concludes that sentence by stating "proof must be sufficient to overcome the presumption that property owned during the marriage is marital." I believe that whether the property is marital is an entirely different consideration and not at all linked to whether the husband gifted the residence to the wife. Rather than combining these principles, I would endorse a two-step analysis. First, the husband had to overcome the statutory presumption and prove by clear and convincing evidence that the property was non-marital. Then, it was the wife's burden to prove by clear and convincing evidence that husband gifted her a half-interest in the residence. *Howell v. Herald*, 197 S.W.3d 505, 507–08 (Ky. 2006) (inter vivos gifts must be proven by clear and convincing evidence). Therefore, I concur in part and dissent in part from the majority and join Justice Noble's separate opinion in all respects apart from that outlined above.