RENDERED:  FEBRUARY 16, 2024; 10:00 A.M.
NOT TO BE PUBLISHED

# Commonwealth of Kentucky

# Court of Appeals

NO. 2023-CA-0723-MR

JOSEPH TAYLOR                                                                     APPELLANT


APPEAL FROM DAVIESS CIRCUIT COURT
v.          HONORABLE LISA P. JONES, JUDGE
ACTION NO. 22-CI-00315


JUDITH SMITH AND
HARRY A. SMITH                                                                   APPELLEES


OPINION
AFFIRMING

** ** ** ** **

BEFORE:  CALDWELL, CETRULO, AND JONES, JUDGES.

CETRULO, JUDGE:  Appellant Joseph Taylor ("Mr. Taylor") appeals the Daviess

Circuit Court order finding that he had not adversely possessed a portion of

property owned by his neighbors, Appellees Judith Smith ("Mrs. Smith") and

Harry A. Smith (together, the "Smiths").  Upon review, we affirm the Daviess

Circuit Court.

## FACTUAL AND PROCEDURAL HISTORY

Mr. Taylor owns property located at 5360 Highway 144, which he received from his mother in 2011. The Smiths own the neighboring property, 5346 Highway 144, which they purchased in February 2022. A month later, the Smiths prepared to construct a garage on the property. During that preparation, the Smiths hired a surveyor to determine and mark the property line between the two properties. Once the surveyor established the line, the Smiths realized a split rail fence had been erected a few feet off the line, on their side of the property. The Smiths removed the split rail fence.[1] Mr. Taylor then confronted the Smiths and claimed ownership of the land between the surveyed line and the line the split rail fence had made ("Disputed Property") by adverse possession.

In April 2022, Mr. Taylor filed suit against the Smiths arguing he had adversely possessed the Disputed Property by placing a fence between the properties, "such that the [Disputed Property] had been continuously maintained and enjoyed by [Mr. Taylor]." As such, Mr. Taylor argued the Disputed Property belonged to him, and the Smiths had no claim to that land. Mr. Taylor requested a bench trial on the matter, which the trial court held in April 2023.

---

[1] Later, the trial court ordered the Smiths to return the fence to its original position during the course of the lawsuit.

At trial, Mr. Taylor testified and presented four additional witnesses: Edward Gazelle ("Mr. Gazelle"), who owned the Smiths' property from 1992 to 2004; Mark Hurt ("Mr. Hurt"), Mr. Gazelle's stepson, who previously lived on the Smiths' property from 1992 to 1993 but was a tenant on Mr. Taylor's property at the time of trial; Richard Castlen ("Mr. Castlen"), a local resident familiar with the properties; and Wesley Yeiser ("Mr. Yeiser"), Mr. Taylor's friend and a local farmer who sharecropped Mr. Taylor's property. Additionally, Mrs. Smith testified and presented John DeJarnette ("Mr. DeJarnette"), who owned the Smiths' property from 2006 to 2022, and Mark Phelps ("Mr. Phelps"), who surveyed the Smiths' property in March 2022.

Mr. Gazelle testified that there had been a fence on the Smiths' property when he resided there from 1992 to 2004. The fence separated the Smiths' property from Mr. Taylor's property. Mr. Gazelle testified that he did not move, alter, nor maintain the fence while he lived on the property. Mr. Hurt testified that he had been renting Mr. Taylor's property for ten years and as part of the agreement, he mowed the yard. He noted that he sometimes mowed around the fence, but sometimes Mr. DeJarnette mowed around the fence before the Smiths bought the property.[2] Mr. Hurt testified that since the time he began renting Mr.

---

[2] Later, Mr. Hurt said that he could not recall whether Mr. DeJarnette mowed on Mr. Taylor's side of the fence.

-3-

Taylor's property, the fence separating the property from the Smiths had been the same; however, he could not say it was the same fence from 1992 because that one was painted.

Next, Mr. Castlen explained that he had lived across the street from the Disputed Property his entire life, starting in 1956. Although he was regularly on the property as a child, in the last couple of years, he was on the property only two or three times per year. He recalled a wire fence being on the property when he was a child and did not recall seeing anyone move or alter that fence. Yet Mr. Castlen could not recall the current material of the fence. The Smiths' counsel showed Mr. Castlen photos of the fence; however, he could not recall whether it was in the same place as the one from his childhood. Mr. Yeiser explained that he had been leasing farmland on Mr. Taylor's property since 1995. Indeed, he was on the property multiple times in the spring, summer, and fall but did not access the property in the winter. He noted that there was a wooden fence separating Mr. Taylor's and the Smiths' properties, which he recalled being there since 1995; however, he could not say for certain whether the fence had ever been moved or altered.

Mr. Taylor testified that his parents, from whom he acquired the property, had obtained the property in the late 1950s. Mr. Taylor emphatically stated that there had been a fence separating that property from what is now the

Smiths' since the 1920s. He added that the fence had been in the same location that entire time, but the fence eventually changed from a wire fence to a plastic fence in the 1990s. He could not recall who replaced the fence or when that happened. Years later, the fence changed again when Mr. DeJarnette erected a wooden split rail fence. In terms of maintenance, Mr. Taylor stated that he sprayed the fence with herbicide and mowed the area. When a larger fix needed to be made, he recalled that Mr. DeJarnette had fixed it, and Mr. Taylor paid for the materials.

Mr. DeJarnette testified that around 2008, the boundary between the properties was overgrown with bushes and trees – so high and thick that he could not see Mr. Taylor's house – and there was not a visible fence. The Smiths presented aerial photos of the property line around 2008, depicting the overgrowth. Further, Mr. DeJarnette testified that he did not recall tearing down a fence while he cleared the area, nor did he recall finding any manmade materials. Once cleared, Mr. DeJarnette testified that he erected the split rail fence along the boundary line. He used two monuments near the overgrowth to estimate what he assumed was the property line. Additionally, Mr. DeJarnette testified that he maintained the fence, mowing and weeding on both sides, and that Mr. Taylor bushhogged on Mr. Taylor's side of the fence less than once a month "during the season." Occasionally, Mr. DeJarnette even mowed Mr. Taylor's field to be

"neighborly." Mr. Taylor's attorney showed Mr. DeJarnette a photo of the plastic fence from the 1990s, and Mr. DeJarnette emphasized that when he moved onto the Smiths' property in 2006, that fence was not visible if it still existed.

Mrs. Smith testified regarding the hiring of Mr. Phelps to survey their property and her discussions with Mr. Taylor regarding adverse possession. Mrs. Smith noted that, although the parties agreed to discuss options concerning the property line, Mr. Taylor ultimately filed the lawsuit and bushhogged the stakes the surveyor had placed. Finally, Mr. Phelps testified that he used historical documents[3] and the Smiths' deed to identify the bounds of the property. Mr. Phelps had no difficulty finding the monuments described in those documents and marked the boundary line with stakes. Further, he explained that the historical documents suggested that there had been a fence along the boundary line at some time, but when he surveyed the area, there was no fence along that line.[4]

In May 2023, the trial court entered its judgment and order on the bench trial ("Judgment"), finding that Mr. Taylor failed to establish all the elements of adverse possession by clear and convincing evidence. As such, the court found that the Disputed Property belonged to the Smiths. The next month,

---

[3] These included a 1947 survey of the Smiths' property.

[4] Although there was a fence near the shared driveway of the properties, the split rail fence pulled away from the property line "as it went back."

-6-

Mr. Taylor filed a Kentucky Rule of Civil Procedure ("CR") 60.02 motion to modify or amend the Judgment, which the court denied. Mr. Taylor then appealed the trial court's Judgment.

## STANDARD OF REVIEW

> Our standard of review is governed by CR[5] 52.01. *Croley v. Alsip*, 602 S.W.2d 418, 419 (Ky. 1980) (CR 52.01 is applicable in boundary disputes.). When reviewing an action taken by a trial court without a jury, we may not reverse its findings of fact unless they were clearly erroneous. Clear error only occurs when there is not substantial evidence in the record to support the trial court's findings. *M.P.S. v. Cabinet for Human Res.*, 979 S.W.2d 114, 116 (Ky. App. 1998). Substantial evidence is that which is "proof sufficient to induce conviction in the mind of a reasonable person." *Rearden v. Rearden*, 296 S.W.3d 438, 441 (Ky. App. 2009).

*Elsea v Day*, 448 S.W.3d 259, 263 (Ky. App. 2014).

## ANALYSIS

Mr. Taylor argues that the trial court misapplied the law regarding adverse possession and that the trial court's ruling against Mr. Taylor was significant enough to result in an unfair ruling. We disagree. Kentucky precedent is clear that to establish a claim for adverse possession, the claimant must prove, by clear and convincing evidence, that the "1) possession [was] hostile and under a claim of right, 2) it [was] actual, 3) it [was] exclusive, 4) it [was] continuous, and

---

[5] Kentucky Rules of Civil Procedure.

-7-

5) it [was] open and notorious." *Id.* (quoting *Appalachian Reg'l Healthcare, Inc. v. Royal Crown Bottling Co.*, 824 S.W.2d 878, 880 (Ky. 1992)). "Further, these common law elements of adverse possession must all be maintained for the statutory period of fifteen years[.]" *Id.*

While Mr. Taylor agrees with the trial court's findings regarding the "tenancy by the parties of the property in question[,]" he disagrees with the findings that he did not meet his burden of proof on steps four and five of the rule. Specifically, he contends that the testimony of his "four witnesses far outweighed the testimony of [the Smiths'] single witness"[6] regarding those issues. However, it is clear that a trial court's decisions regarding witness credibility are not quantitative analyses. Instead, "due regard shall be given to the opportunity of the trial court to judge the credibility of the witnesses." *Barber v. Bradley*, 505 S.W.3d 749, 754 (Ky. 2016) (quoting CR 52.01) (internal quotation marks omitted). Further, "judging the credibility of witnesses and weighing evidence are tasks within the exclusive province *of the trial court*." *Id.* (internal quotation marks and citation omitted). Here, the trial court's findings regarding steps four and five of the rule were supported by substantial evidence.

---

[6] It is unclear why Mr. Taylor suggests there was only one witness; Mr. Phelps, Mr. DeJarnette, and Mrs. Smith testified on behalf of the Smiths.

-8-

As to step four, continuous possession, Mr. Taylor had the burden to prove he had continuously asserted "dominion over the property." *Thompson v. Ratcliff*, 245 S.W.2d 592, 593 (Ky. 1952). Continuous possession requires the claimant to act in a way that would "furnish a cause of action in ejectment or for trespass every day during the statutory period of fifteen years." *Ballard v. Moss*, 268 S.W.2d 35, 37 (Ky. 1954) (citations omitted). Although Mr. Taylor presented evidence that he mowed the Disputed Property and sprayed for weeds "during the season," the Smiths contend that Mr. Taylor's possession was not continuous because Mr. Taylor's upkeep was only occasional and Mr. DaJarnette had testified that he, too, maintained both sides of the fence. Additionally, most of the witnesses testified that the location, material, and existence of the fence varied over the relevant 15-year period.

Indeed, the trial court found that Mr. Castlen and Mr. Taylor's testimonies indicated that in the 1960s or 1970s, the fence was made of wire; however, Mr. Castlen could not say what type of fence was presently on the property, when it was placed there, or whether it was on "the same footer" as the wire fence. Further, the trial court found it compelling that Mr. Taylor did not present evidence "regarding who built the white [plastic] fence, when it was built, where it was placed, or if the wire fence which is visible in the foreground of the photo was still in place nearby the white [plastic] fence."

As such, the trial court concluded that Mr. Taylor "failed to show the white [plastic] fence marked the same line as the wire fence, and thus" the court found there was not clear and convincing evidence that there was continuous possession since Mr. Taylor's childhood, as he claimed. The evidence the trial court relied on was "sufficient to induce conviction in the mind of a reasonable person." *See Rearden*, 296 S.W.3d at 441. Therefore, there was substantial evidence that Mr. Taylor did not act every day in such a manner that would "furnish a cause of action in ejectment or for trespass." *See Ballard*, 268 S.W.2d at 37. The trial court's finding was not clearly erroneous.

As to step five, open and notorious possession, Mr. Taylor had the burden to prove that he "openly evince[d] a purpose to hold dominion over the property with such hostility that w[ould] give the non-possessory owner notice of the adverse claim." *Phillips v. Akers*, 103 S.W.3d 705, 708 (Ky. App. 2002) (citation omitted). Our precedent has clarified the types of actions that constitute such possession. In *Moore v. Stills*, 307 S.W.3d 71, 78 (Ky. 2010), our Supreme Court explained

> [i]t is not enough . . . that one merely stretch one's boundary to include property beyond one's deed. One may not, while living on one's rightful property "acquire title through such a stretching operation to other property about which he might mark a line. . . . He is not in possession of it, if while he is living on another tract, he simply mentally extends his claim over it."

-10-

(Citation omitted.)

There, the Court gave various examples of actions that did not meet the requisite burden to establish adverse possession: *e.g.*, "the surveying and marking of a boundary, the payment of taxes, and occasional entries for the purpose of cutting timber are not sufficient to constitute adverse possession[,]" *id.* (citing *Flinn v. Blakeman*, 71 S.W.2d 961, 969 (Ky. 1934), *overruled on other grounds by Warfield Nat'l Gas Co. v. Ward*, 149 S.W.2d 705 (Ky. 1940)); "such uses as the masting of hogs, the ranging of cattle, the conducting of a sugar camp[,] the operation of a water mill[,] the cutting of bushes and hay[,] the occasional sowing of grass . . . [are] insufficient to establish the actual possession of another's land[,]" *id.* at 79; "cutting hay, digging pond, growing crop and similar activities [are] insufficient[,]" *id.* (citing *Ky. Women's Christian Temperance Union v. Thomas*, 412 S.W.2d 869 (Ky. 1967)); "establishing worm bed, spraying for poison ivy, planting clover and trees" were found insufficient, *id.* at 79 (citing *Pierz v. Gorski*, 276 N.W.2d 352 (Wis. App. 1979)); and "the roaming of cattle and hogs, the posting of signs forbidding trespassing, [and] driving away hunters from time to time" were insufficient, *id.* (citing *Rowland v. McLain*, 70 S.E.2d 918, 920 (Ga. 1952)).

Here, the trial court determined that Mr. Taylor did not meet his burden of proof because he made no improvements to the Disputed Property to

give notice to the Smiths of his adverse claim. Likewise, the trial court found there was not clear and convincing evidence that the white plastic fence had remained in the same location since the 1990s:

> Though many witnesses – friends and tenants of [Mr. Taylor] – testified that they observed that the white fence has been in place since the 1990's [*sic*], the Court does not find their claims credible. [Mr. Taylor] himself testified that Mr. DeJarnette put up a new fence, and Mr. Hurt noted that the present fence does not look like the fence he recalls from the 1990's [*sic*].

Additionally, the trial court noted that the aerial photographs from 2008 showed thick brush and overgrowth in the disputed area, and Mr. DeJarnette testified that when he cleared the area, he found no evidence of a fence. Although Mr. Taylor testified that Mr. DeJarnette asked for his permission to build the new fence and promised Mr. Taylor he would put it in the same place as the old fence, Mr. DeJarnette testified that he never spoke with Mr. Taylor regarding the fence, did not find evidence of an old fence, and created the line for his split rail fence using two monuments and what he "thought" was the property line. The trial court acknowledged that regardless of whose testimony was accurate, Mr. Taylor failed to prove that Mr. DeJarnette placed the new fence where the old fence had been.

Finally, the trial court again emphasized the aerial photographs showing overgrowth and brush along the boundary line. The court acknowledged that such conditions called "into question the memories of [Mr. Taylor's]

-12-

witnesses." Therefore, the court found Mr. DeJarnette's testimony more credible. As such, there was not sufficient evidence that Mr. Taylor's possession had been open and notorious prior to Mr. DeJarnette clearing the area and placing a new fence along the boundary.

The trial court concluded that

> [w]hile the erection of a fence is a good indicator of a claimant's intent to hold property adversely . . . [Mr. Taylor] did not construct the present fence though he has received the benefit of it. Moreover, that fence has not been in place for fifteen years. Over the years, there have been many fences separating these two properties and, [*sic*] maybe even no fences for a period. Case law states that "a long-existing fence may serve as a well-defined boundary [*Elsea v. Day*, 448 S.W.3d at 264], but this fence is not long-existing and [Mr. Taylor] has failed to prove that its present location is the "well-defined boundary" that has defined these two properties over those many years.

The testimony established that Mr. Taylor occasionally mowed the grass on the Disputed Property and sprayed for weeds. However, there was no explicit evidence presented at trial that he conducted such activities on a fence in the same exact location. To the contrary, there was extensive evidence that the fence had moved over the years, and at times likely did not exist. Moreover, as the trial court detailed, our caselaw is clear that simply marking a line is not sufficient to establish an adverse possession claim. Accordingly, the trial court did not err

-13-

when it determined the evidence supported a finding that Mr. Taylor had not openly and notoriously possessed the Disputed Property.

## CONCLUSION

The Daviess Circuit Court properly identified the law governing adverse possession, supported its findings of fact with substantial evidence, and appropriately applied those facts to the relevant law to determine that Mr. Taylor did not adversely possess the Disputed Property. As such, we AFFIRM the trial court's judgment.

ALL CONCUR.

BRIEFS FOR APPELLANT:

Matthew C. Tierney
Owensboro, Kentucky

BRIEF FOR APPELLEES:

Marty G. Jacobs
Owensboro, Kentucky