RENDERED: MAY 5, 2016
TO-BE-PUBLISHED

**Supreme Court of Kentucky**

2014-SC-000324-DG

DATE 5-26-16 Elizabeth ___ D.C.

JOHN WESLEY BAYS                                                          APPELLANT


ON REVIEW FROM COURT OF APPEALS
V.                             CASE NO. 2012-CA-002218-MR
KNOX CIRCUIT COURT NOS. 07-CI-00371, 07-CI-00631 AND
09-CI-00246


KRISTIE D. KIPHART, INDIVIDUALLY AND AS
TRUSTEE OF THE DEMAND RIGHT
IRREVOCABLE TRUST FOR BRYCE A. BAYS                    APPELLEE


**OPINION OF THE COURT BY JUSTICE NOBLE**

**<u>AFFIRMING</u>**

This case presents the question whether a dying spouse's decision to remove the surviving spouse as a life-insurance beneficiary and to name someone else can constitute fraud on the surviving spouse's statutory elective share. Like the Court of Appeals, this Court concludes that it cannot.

**I. Background**

John Wesley Bays and Carole Kiphart married in 2000. They had one child, Bryce Bays. In 2001, John and Carole executed reciprocal wills. Carole was a physician and had a substantial income.

In 2000, Carole obtained a life-insurance policy through Prudential Insurance Company for $125,000. Her husband was initially named as a beneficiary of this policy, but little else is known about it. Presumably, it is standard term life insurance.

In January 2002, she also obtained a $750,000 policy from American General Life Insurance Company, with the benefits payable 80% to her husband and 20% to her son. Although this policy was generally a term life policy (with a thirty-year term), it had two facets that set it apart from ordinary term-life insurance. First, it was a return-of-premium policy, meaning that at the end of the term, if Carole lived, all of her premiums would be returned to her. Under this provision, the policy built up a cash value over time, and could be surrendered in exchange for this cash value. The cash value did not build up linearly, representing the full value of the premiums from the beginning. Instead, it had no cash value for its first five years, with a cash value beginning to accrue at the end of the sixth year. Even then, the cash value was substantially less than the premiums paid. The cash value was not to equal the premiums paid until the end of the thirty-year term. (Carole would die shortly before the end of the sixth year of the policy, that is, five years and ten months into the policy.)

The policy also included a terminal-illness accelerated benefit rider. Under that provision, if Carole was diagnosed with a terminal illness and was expected to die within twelve months, she could call up to 50% of the proceeds of the policy, to a maximum of $250,000. Exercising this option would have reduced the benefit payable on her death to any named beneficiary.

Carole was diagnosed with cancer in December 2006. Despite this diagnosis, Carole never invoked the terminal-illness acceleration rider on her American General Policy.

In September 2007, Carole was admitted to the Markey Cancer Center in Lexington, Kentucky. While there, and without John's knowledge, she executed a new will that largely disinherited her husband. She had relatively liquid assets (such as a certificate of deposit for more than $90,000, multiple bank accounts, and a retirement account) and other valuable personal property (such as horses), with a combined value of over $150,000. Nonetheless, she mostly left John only personal and household effects in the new will. The will also purported to "bar ... dower and all statutory marital rights he may have in [her] estate." The will included a holographic codicil disposing of the bulk of the estate, with many specific bequests of cash, horses, a truck, and other property, largely to members of Carole's family.

Around the same time, Carole also created two trusts, the Demand Right Irrevocable Trust for Bryce A. Bays and the Carole Kiphart Bays Living Trust. At that time, she removed John and Bryce[1] as beneficiaries on the life-insurance policies, and instead named the trusts as the beneficiaries. The American General policy's proceeds were to be paid into the Demand Right Irrevocable Trust, and the Prudential policy's proceeds were to be paid into the Living Trust.

Carole died on October 28, 2007. In November 2007, Carole's September 2007 will was admitted to probate, and her sister, Kristie Kiphart, was appointed executrix of the estate under the September 2007 will. Kristie was also trustee of both trusts. She invested the proceeds of the American General

---

[1] The Prudential policy's beneficiary had already been changed earlier in 2007 to Bryce Bays.

policy with Raymond James & Associates, and the proceeds of the Prudential policy were paid into the Knox Circuit Court Clerk, under an agreed order.

John quickly began challenging what had occurred. In December, he renounced the will under KRS 392.080, and instead elected to take his spousal share under KRS 392.020. He also filed a declaration of rights action with respect to the will, seeking to recover the portion of his spousal share that may have been delivered to various legatees under the will and to the beneficiaries of the life insurance policies. His primary theory was that there was fraud on his statutory spousal interest because the beneficiaries of the insurance policies had been changed and the trusts established without his knowledge or consent, and the policies (and their proceeds) were part of Carole's estate.

In 2008, John also filed a separate action to recover money that he claimed was missing from a safe-deposit box he had shared with his wife. And in 2009, he sued to have the September 2007 will declared void because it was not executed in accordance with KRS 394.040. The Knox Circuit Court consolidated all three actions.

The circuit court held in John's favor with respect to the will, declaring it void. The will itself proclaimed that it had been executed in Louisville, although there is no question that Carole signed it in Lexington. Additionally, one of the witnesses did not actually see Carole sign the will and, instead, later signed as a witness in Louisville, as did the notary who certified the signatures. Thus, the will clearly failed to meet the requirements of KRS 394.040, which states that a non-holographic will is valid only if the testator signs the will "in the presence

4

of at least two (2) credible witnesses, who shall subscribe the will with their names in the presence of the testator, and in the presence of each other."

The other claims were decided in a bench trial in 2011. The circuit court denied John's claim about the cash that he claimed was supposed to be in the safe-deposit box, concluding there was insufficient evidence. But the court found in John's favor with respect to the claimed fraud on his statutory spousal interest. Specifically, the court found that John did not know or consent to the changes of insurance-policy beneficiaries or the creation of the trusts to be funded with the proceeds of the policies. And the court concluded that those were "fraudulent [inter] vivos transfers." Moreover, the court held that the insurance policies were personalty to be considered in calculating John's share of his wife's estate. (By statute, he is entitled to one half of all surplus personalty after renouncing the will.) Based on this, the court entered judgment in John's favor for $454,093.38, plus interest. This amount represented one half of the insurance proceeds and other property that was part of Carole's estate at the time of her death after an off-set representing the ownership interests of John and Bryce in some of those assets.

The Court of Appeals, by a split vote, reversed and remanded. The court concluded that a surviving husband's statutory spousal interest does not attach to the proceeds of life insurance because they are never part of the decedent's estate. Instead, all the decedent ever owned was the insurance policies themselves, which are separable from any benefits payable on death. The court noted that to hold otherwise would "create chaos in the realm of estate planning" and "would also place insurance companies in an untenable

5

position of honoring the contract of an insured in the face of a dower or curtesy claim by a surviving spouse." The court also noted that Carole, as the owner of the insurance policies, had an absolute right to change the beneficiaries of those policies without John's knowledge or consent.

John sought discretionary review, which this Court granted.

## II. Analysis

A surviving spouse is generally entitled, by law, to a share of a dead spouse's estate. That share includes a portion of the dead spouse's real estate, the amount of which depends on whether there is a will that the surviving spouse elects against, and, in every case, "an absolute estate in one-half (1/2) of the surplus personalty left by the decedent." KRS 392.020. At common law, this share, or some version of it, was called dower (for widows) and curtesy (for widowers).[2] That share cannot be defeated even by a will excluding the surviving spouse and disposing of all the decedent's estate. *See* KRS 392.080 (allowing the surviving spouse to renounce the will and claim the statutory share, albeit at a reduced level with respect to real estate).

Nevertheless, dying spouses sometimes attempt to defeat the surviving spouse's statutory share by disposing of property prior to death through *inter*

---

[2] At common law, the rights differed. Dower was a one-third right the widow had in the deceased husband's real estate, whereas curtesy was a right to *all* of the deceased wife's real property, if children were born of the marriage. Both interests were life estates, rather than fee estates. *Compare Black's Law Dictionary* (10th ed. 2014) (definitions of *dower*), *with id.* (definition of *curtesy*).

Given the modern departure from these common-law interests, the share is better referred to as a statutory spousal share, or some variation of that term, instead of the traditional terms. Since it can be taken in lieu of a bequest in a will, where the surviving spouse elects against or renounces the will, it is often called an elective share.

6

*vivos* transfer of assets to third parties. The schemes used in such attempts range from simple transfers of cash, *Benge v. Barnett*, 217 S.W.2d 782, 782 (Ky. 1949); *Martin v. Martin,* 138 S.W.2d 509, 511 (Ky. 1940), to more complex deals, such as purchasing real estate in the name of another person, *Rowe v. Ratliff,* 104 S.W.2d 437, 438 (Ky. 1937), or placing cash into joint accounts with third parties, *Harris v. Rock,* 799 S.W.2d 10, 11 (Ky. 1990).

Such attempts, when directed to defeating the surviving spouse's share rather than constituting bona fide gifts, are deemed fraudulent. And this Court and its predecessor have repeatedly stated that such attempts are improper and may be unwound, at least to the extent needed to fund the surviving spouse's share. *See Harris,* 799 S.W.2d at 11; *Martin,* 138 S.W.2d at 515; *Benge,* 217 S.W.2d at 784; *Rowe,* 104 S.W.2d at 439. The rule, stated simply (and traditionally), is that "a man may not make a voluntary transfer of either his real or personal estate with the intent to prevent his wife, or intended wife, from sharing in such property at his death and that the wife, on the husband's death, may assert her marital rights in such property in the hands of the donee." *Martin,* 138 S.W.2d at 515. Although the common-law rights distinguished between husband and wife, the modern statute to which this rule attaches is gender neutral, granting the same rights to both spouses, and thus the same rule applies to a woman who attempts to defeat her husband's spousal rights, as has been alleged in this case.

Here, the alleged fraudulent scheme consisted of changing the named beneficiaries on a pair of life insurance policies shortly before Carole's death, and making them payable into a pair of trusts for the benefit of her minor son.

As noted above, the trial court concluded that these acts were "fraudulent [inter] vivos transfers," and thus invoked the fraud rule to recapture part of the insurance proceeds.

John makes much of this fraud finding, arguing that appellate review should be limited to the clear-error standard as a result. The Court of Appeals addressed this claim by concluding that "because ... the trial court erred in its characterization of the life insurance proceeds as personalty, its finding of fraud is unnecessary and irrelevant." John objects that in so concluding, the Court of Appeals overlooked that his claim was one of fraud on his statutory spousal interest, and not simply the interpretation of insurance policies in the estate setting.

This Court disagrees. The trial court's finding is premised on a legal conclusion: that the life-insurance policies were personalty and thus the proceeds of the life-insurance policies were also personalty. From this, the court reasoned that the proceeds were part of Carole's estate at the time she died. This was a conclusion of law, not fact, and as such it is reviewed *de novo*.

Whether any transactions related to the proceeds may be found to be fraudulent depends first on their being part of the decedent's property during her lifetime. It is only if the proceeds are part of her property that a claim of fraud becomes relevant because the surviving spouse's statutory share extends only to property that belonged to the dead spouse during her lifetime. If the

proceeds were not part of the dead spouse's property, a finding of fraud would not have to be made.[3]

Indeed, this case, despite the various arguments made by the parties, turns on that simple question. Are the proceeds of a life-insurance policy payable to a third-party beneficiary part of the decedent's property and thus subject to the surviving spouse's statutory interest and, by extension, recoverable by a claim of fraud on the surviving spouse's statutory share? The answer is no.

The trial court's approach in this case confused the life-insurance policies, which were owned by Carole, with their proceeds, which were never owned by Carole and would never have become part of her estate. Indeed, the trial court's reasoning in this respect depended on the conclusion that "[t]he insurance policies ... are personalty of the estate." That may be true, in a sense, but we are concerned not with the policies themselves, but with their proceeds.

This Court's predecessor held that the proceeds of life insurance, at least where the insured has the contractual right to change beneficiaries, cannot be recovered as part of the surviving spouse's statutory share. *See Farley v. First Nat. Bank*, 61 S.W.2d 1059, 1061 (Ky. 1933). In *Farley*, the decedent changed the beneficiary from his estate, in which his wife, though estranged at the time, would have shared, to his children, and then committed suicide. *Id.* at 1060.

---

[3] The order of the trial court's conclusions illustrates this error. It first found that the changes of beneficiaries were fraudulent *inter vivos* transfers, and then concluded that the policies were part of Carole's personalty (and thus so were the proceeds). This reverses the order in which the issues should have been analyzed.

9

The wife challenged the beneficiary change as "fraud ... of [her] marital rights." *Id.* at 1061. The court denied the claim, stating: "Where the right to change the beneficiary is reserved by the insured, this right is a part of the contract from its inception, and may be exercised by the insured at any time before his death, for not until then does the right of the named beneficiary become vested." *Id.* The Court further stated that "[t]he named beneficiary in a policy of insurance which provided for a change of beneficiaries has no vested interest during the life of the insured; his interest is a mere expectancy." *Id.*

The Court concluded that "[t]he right of the insured to make the change is *absolute* unless equities have intervened, which is not the case here, and the beneficiary cannot prevent it by objecting." *Id.* (emphasis added). The soundness of this point was illustrated by the fact that "[t]he insured may permit the policy to lapse, and no one can complain." *Id.* The Court further explained its conclusion by noting:

> It is an essential part of the contract that he retains control of the policy, at least, to the extent of changing the beneficiary. Whether the change shall be made is wholly under his control and the manner of making it is entirely a matter between him and the insurer.

*Id.*

Similarly, in *National Life & Acc. Ins. Co. v. Walker*, 246 S.W.2d 139, 139 (Ky. 1952), the decedent's wife was originally named the beneficiary of three life-insurance policies, but the beneficiary was changed to the decedent's mother. The wife in that case did not claim fraud on her marital interest, *per se*, but instead claimed that the change of beneficiaries violated KRS 297.140 (now KRS 304.14-340), which makes the proceeds of any life-insurance policy

10

payable to a wife part of her separate estate (and thus protected from the husband's creditors), and allows a woman to take out a policy on her husband, without his consent, with the proceeds again inuring only to her benefit. But the policy in *Walker* still allowed the insured, the husband, to change the beneficiary, and the evidence established that the husband was the contracting party, not the wife. *Id.* at 140.

Again, the Court held "that a designated beneficiary in a policy of insurance has no vested interest therein where the insured is authorized by the contract to change the beneficiary at his pleasure with the consent of the insurer." *Id.* Because the policy allowed the husband to change the beneficiary, and he did so before his death, the wife "never acquired a vested right in the proceeds which prevented the change in the beneficiary." *Id.* at 141.

These cases alone would appear to control the outcome of this case. John at most had a contingent interest, and Carole retained an absolute contractual right to change the beneficiary of her policies. Her decision to exercise that right cannot be fraud on John's statutory interest because she never owned the proceeds of the insurance policies. The proceeds would thus never become part of her estate, and would instead pass outside it.[4] Even if she intentionally acted to defeat any claim in the proceeds, such conduct would not be fraud on John's statutory interest because that interest could never attach to those proceeds. His interest was at best contingent, created only by Carole's

_____

[4] They would have, of course, if her estate had been named her beneficiary. But those are not the facts of this case.

11

naming him as a beneficiary, and that interest was defeated when she named another beneficiary and subsequently died.

The trial court attempted to avoid the effect of this law by treating the insurance policies like joint bank accounts. The court emphasized that the larger policy had a terminal-illness acceleration rider, by which Carole could have accessed a portion of the proceeds upon her diagnosis with a terminal illness. Because the policy had an existing cash value of sorts, the court reasoned, it was no different than any other property that Carole owned.

But as the Court of Appeals pointed out, the rider limited the total that could be accessed in this manner to $250,000, far short of the full benefits to be paid. Thus, even if the trial court was correct, only that amount could be considered as part of Carole's personalty.

More importantly, however, even if a life-insurance policy has a cash value, it does not attach to the decedent's estate in such a way as to give a surviving spouse a statutory interest in it. As this Court's predecessor noted in *Farley*, although a "policy of life insurance having a cash surrender value is sometimes spoken of as property, ... it has attributes different from other forms of property." 61 S.W.2d at 1061. Chief among those differences is that "[l]ife insurance is chiefly for the purpose of creating an asset at the death of the insured for the benefit of his estate or of a named beneficiary." *Id.* Again, "[w]here the right to change the beneficiary is reserved by the insured, this right is a part of the contract from its inception, and may be exercised by the insured at any time before his death, for not until then does the right of the named beneficiary become vested." *Id.*

12

It could be argued that the trial court's joint-account analogy was accurate at least with respect to the $250,000 in proceeds that Carole could have accelerated. Presumably she could have met the policy's requirements of proving a terminal illness and thus could have exercised her rights under the rider. Thus, she had a contractual option on $250,000 in proceeds that she had a right to. But the trial court's analogy breaks down because Carole never exercised her option. Unlike a joint bank account, which the decedent had possession of during her life, Carole never had possession of the $250,000 in proceeds.

And the statutory share is limited to "surplus personalty *left by the decedent.*" KRS 392.020 (emphasis added). If Carole never had those proceeds, she could not have left them as part of her estate. This language applies specifically to property that is possessed at the time of death. *Harris*, 799 S.W.2d at 11 ("Surplus personalty as used in the statute means the personalty remaining after the payment of the debts, funeral expenses, charges of administration, and widows exemptions have been deducted from the gross personalty possessed by the decedent at the time of his death."). If Carole never possessed the proceeds, then they never will pass through probate. And when a spouse elects against a will, as John did here, that spouse is limited to the statutory share provided in KRS 392.020.

Carole retained the right to change the beneficiaries of her policies. She owned the policies, and decisions with respect to them belonged exclusively to her. Similarly, the option to exercise the acceleration clause belonged solely to Carole. John could not have forced her to exercise that option, thereby

13

converting the policy into cash, any more than he could have forced her to continue paying the premiums on the policy if she chose to discontinue it. Upon her death, the acceleration option evaporated and was displaced by the insurer's obligation to pay out the policy to the named beneficiaries. The existence of such an option was simply irrelevant until and unless Carole exercised it. In this case, she did not. Thus, any cash value she could have extracted from the policy never manifested and thus could not have been part of her estate.

Moreover, for property that Carole did not possess at the time of her death to be imputed to her estate, to be treated as surplus personalty, there must be proof of fraud. *See Harris*, 799 S.W.2d at 15 ("So, how does this property, these joint accounts, get to be surplus at death, subject to the dower statute? It doesn't, unless there is proof someone has been defrauded."). This is where the joint-account analog breaks down even further. There is no suggestion of fraud with respect to Carole's failure to invoke the terminal-illness rider. The trial court found that changing the beneficiaries on the policies constituted fraudulent *inter vivos* transfers but said nothing about Carole's failure to invoke the rider. And there is no evidence from which fraud could be inferred. There was not, for example, evidence of an agreement between Carole and John by which she would accelerate the proceeds to pay for her care and thus leave the rest of her property intact for him to use after her death. If there was such an agreement, but Carole, instead of calling the

14

rider, actually used up money in her bank accounts, a finding of fraud might be justified.[5]

In the absence of such fraud, there can be no fraud on John's statutory share. Indeed, there is no *inter vivos* transfer in the first place to undo, unlike with a true joint account, because all Carole did was decline to draw assets into her estate while living.

Finally, we recognize that *Farley* qualified the otherwise absolute "right of the insured to make the change" by noting that the situation could be different where "equities have intervened." 61 S.W.2d at 1061. But like in *Farley*, that "is not the case here." *Id.* John was able to renounce his wife's will and obtain his statutory share of the property that was actually part of her estate (or should have been). He was not completely disinherited. Moreover, the life-insurance proceeds were not put to some seemingly improper use, such as being paid to an adulterous paramour or to a shady con artist who had connived his way into Carole's life. They were, instead, paid into trust for the benefit of Carol's and John's young child, Bryce. Surely that is not the type of scenario for which equity would give John a remedy—possibly at the expense of his own child.

---

[5] This also explains why the $100-million example employed by the dissent in the Court of Appeals in this case does not undermine the rule laid out above that life insurance proceeds are not to be treated as part of the decedent's personalty. The dissent offered the example of a spouse with a $101-million cash estate. The spouse has a terminal illness and spends $100 million on a one-time premium to buy a $95-million life insurance policy payable to someone other than the surviving spouse. In such a case, with the vast bulk of the estate being diverted at the last minute to life insurance, a trial court would be justified in finding a fraudulent transfer. In our case, however, the analogous transfers are the regular payments of the premiums of about $1,300 per year. There is no reason to believe those payments were attempts to defraud John's statutory share.

### III. Conclusion

A life-insurance beneficiary has only a contingent interest in the benefits of the policy, and where the insured retains the right to change the beneficiary, that right is virtually absolute. Where a dying spouse exercises that right to remove the surviving spouse as a named beneficiary and instead names a trust for the benefit of the minor child of the marriage, the surviving spouse cannot claim fraud on his or her statutory spousal interest. For that reason, the Court of Appeals is affirmed.

All sitting. All concur.


COUNSEL FOR APPELLANT:

W. Patrick Hauser
W. Patrick Hauser, PSC
PO Box 1900
Barbourville, Kentucky 40906


COUNSEL FOR APPELLEE:

Travis Alan Rossman
Rossman Law, PLLC
220 Court Square
PO Box 209
Barbourville, Kentucky 40906