RENDERED:  OCTOBER 30, 2020; 10:00 A.M.
NOT TO BE PUBLISHED

# Commonwealth of Kentucky

# Court of Appeals

NO. 2019-CA-0425-MR


MITZI SIMPSON AND KAREN HILL,
AS CO-ADMINISTRATORS OF THE
NANNIE CATHERINE WETHINGTON ESTATE                    APPELLANTS


APPEAL FROM MARION CIRCUIT COURT
v.          HONORABLE SAMUEL TODD SPALDING, JUDGE
ACTION NO. 17-CI-00071


JEREMY WETHINGTON, INDIVIDUALLY AND
AS THE ADMINISTRATOR OF THE ESTATE OF
JAMES PATRICK WETHINGTON; AND
KERRY T. WETHINGTON                                      APPELLEES


OPINION
AFFIRMING

** ** ** ** **

BEFORE:  ACREE, CALDWELL, AND K. THOMPSON, JUDGES.

ACREE, JUDGE:  The Estate of Nannie Catherine Wethington appeals an order of

the Marion Circuit Court holding that a transfer of $38,500.00 from Nannie's

husband, Pat Wethington, to his son by a prior marriage, Kerry Wethington, was a

valid *inter vivos* gift. The circuit court also concluded the gift did not defraud Nannie of her statutory spousal share of Pat's Estate, after which it released the funds to Kerry. After careful review, we affirm.

## FACTS AND PROCEDURAL HISTORY

Pat and Nannie were married on July 16, 1990. Pat died intestate on January 5, 2017, survived by Nannie and his four children: Kerry Thomas Wethington; Jeremy Wethington; Valerie Wethington; and James Mills. Nannie was appointed administratrix of Pat's Estate and was awarded the statutory $15,000.00 spousal exemption by the Marion District Court. Nannie died intestate on September 6, 2017, during the pendency of this litigation. Nannie's heirs are: Karen L. Hill; Mitzi Simpson; and Travis Godbey. Mitzi and Karen are co-administratrices of her Estate.

This case centers on a blank check Kerry alleges his father, Pat, signed and gave to him prior to Pat's death. Kerry presented the check to Farmers National Bank (FNB) on January 3, 2017, two days before Pat died, in the amount of $38,500.00. FNB honored the check and deposited the full amount into Kerry's FNB account. After FNB deposited the funds, Nannie told the bank she believed the check had been forged. FNB placed a hold on the funds.[1]

---

[1] Prior to placing a hold on the funds, Kerry testified that he loaned $8,500.00 to Jeff Wethington, which was paid back to him in cash. He also testified that he withdrew $5,000.00 to purchase gates, $500.00 to loan to Tony Carmichael, and an undisclosed amount for rent and

FNB then filed a complaint for interpleader and declaration of rights on March 29, 2017, against Kerry and Nannie Wethington, as administratrix of Pat's Estate. FNB asked that it be discharged and dismissed from the action while the circuit court resolved the dispute between Kerry and Nannie. Nannie, on behalf of Pat's Estate, counterclaimed against FNB asserting, in part, that FNB negligently honored the check. Before any discovery commenced, Nannie died, and Jeremy assumed the role of administrator of Pat's Estate.

FNB moved for summary judgment as to the counterclaim against it, and for authorization to deduct legal fees from the funds. The circuit court granted summary judgment in favor of FNB and awarded legal fees in the amount of $3,643.00. The court then ordered FNB to deliver the remaining funds, $22,392.77,[2] to the Clerk of the Marion Circuit Court pending final judgment.

On May 4, 2018, Jeremy Wethington, as administrator of Pat's Estate, agreed to relinquish any claim to the money. However, Mitzi and Karen, as co-administratrices of Nannie's Estate, filed a motion to intervene and the motion was granted. Pertinent to this appeal, they alleged Kerry fraudulently transferred the

household bills. At the commencement of this action, funds in FNB's possession totaled $26,035.77.

[2] *See* footnote 1, *supra*.

$38,500.00 from Pat's Estate to himself. A bench trial was held on January 14, 2019.

The parties presented conflicting evidence as to how, when, and where Kerry obtained the check. Kerry testified that, at some point in 2015, Pat signed the check at issue and gave it to Jeff Miller as collateral for money Kerry owed, or potentially could owe, Miller.[3] According to Kerry, Pat signed the check at his kitchen table but did not fill in the amount or the payee. Miller corroborated Kerry's testimony to the extent the blank check was originally given to him as collateral and confirmed Pat signed the check. But, he said Pat signed the check at Miller's place of business. Subsequently, Miller noted a lien was placed on real estate owned by Kerry and, at that point, he returned the check to Pat.

Kerry next testified that he took Pat to a doctor's appointment on November 30, 2016. While driving, Pat allegedly gave Kerry the signed check and, according to Kerry, told him to "take every dime he had because that is the only way you will ever get anything." Pat was hospitalized on December 27, 2016, and did not speak with anyone thereafter. Kerry testified that on January 3, 2017, he used Pat's debit card to determine Pat's account balance. The balance was $38,501.49. He then dated the check November 30, 2016, made himself the payee, filled in $38,500.00, and withdrew that amount from Pat's account at FNB.

---

[3] Kerry was an independent contractor who often purchased gates from Miller.

Connie Blandford was the branch manager of FNB at the time Kerry presented the check. She testified to having a conversation with Pat in October 2016, approximately one month before he allegedly gave the check to Kerry. She said Pat called her and inquired into making Kerry a joint owner of his bank account.[4] She told him both parties would need to come to the bank to sign the proper documents. Pat said that could be a problem due to his illness. However, she testified that Pat stated, "I want Kerry to be able to sign checks," and asked, "I can write Kerry a check, right?" She answered in the affirmative.

Blandford was also present on the day Kerry presented the check to FNB. She testified she reviewed the signature card on Pat's account and did not believe it was forged. Likewise, Joseph Jaglowicz, risk manager of FNB, testified that although it was an old check, he believed the signature was similar to Pat's signature card at the bank. The circuit court found Blandford's testimony to be the most credible. The court noted she had no interest in the litigation and no motive to lie. Based on this, the circuit court found that, in October 2016, Pat was contemplating distributing the money in his bank account to Kerry.

Theodore Lavit, former counsel for Pat's Estate, told a different story as to how Kerry received the check. Although his testimony included hearsay, the

---

[4] Nannie and Pat were previously joint owners of the bank account in question. Blandford testified that Nannie signed a document on December 27, 2003, removing herself from the account.

circuit court, sitting as factfinder, heard it all. Lavit testified that Pat's daughter, Valerie, told him Miller, not Pat, gave the check to Kerry on January 3, 2017, at FNB. Before withdrawing as counsel, he "believed" Pat's signature on the check was valid. Valerie contradicted Lavit's testimony about the authenticity of Pat's signature. However, the circuit court found Lavit's testimony more credible because it was supported by his office notes.

Jeremy Wethington testified next. He said he learned of the blank check around the time of Pat's passing. According to his testimony, Kerry told him Miller delivered him the check at a Walmart parking lot on January 3, 2017. He testified he originally believed the signature on the check was legitimate, but now he believes the signature was a forgery.

Wendy Carlson, a handwriting expert, examined the check in question and compared it to known signatures of Pat on sixteen checks, a 1984 affidavit, a 1993 deed, a 1993 marriage certificate, a 1991 mortgage, another document dated in 1993, and a 1969 marriage certificate. She testified there is "no doubt" Pat did not sign the check in question and her degree of certainty on a scale of 1 to 10 was a 10. However, she also acknowledged signatures can change as a person ages.

The circuit court did not find Carlson's testimony credible. It noted the signature on the check in question was different than the documents with which it was compared; however, many of Pat's known signatures also differed

substantially from one another. Moreover, the circuit court also noted that the majority of Pat's known signatures used for comparison were from documents signed prior to 1993 and, in 2017, Pat was much older and ill.

The circuit court made extensive findings. It concluded the allegations that Kerry forged Pat's signature were not proved by a preponderance of the evidence. Additionally, the court believed Kerry's testimony and found Pat intended to gift Kerry money from his bank account. Thus, it concluded the check was a valid *inter vivos* gift. It further concluded there was insufficient evidence to indicate Pat intended to defraud Nannie of her statutory spousal share of his estate by making the gift. This appeal followed.

**ANALYSIS**

On appeal, Nannie's Estate asserts the circuit court erred by finding: (1) that Pat's transfer of the check to Kerry was an *inter vivos* gift; and (2) that Pat did not intend to defraud Nannie of her statutory spousal share of his estate.

An appellate court's review of a bench trial is governed by CR[5] 52.01, which provides in relevant part that "[f]indings of fact, shall not be set aside unless clearly erroneous, and due regard shall be given to the opportunity of the trial court to judge the credibility of the witnesses." Factual findings are clearly erroneous if unsupported by substantial evidence, which is "[e]vidence that a reasonable mind

---

[5] Kentucky Rules of Civil Procedure.

would accept as adequate to support a conclusion." *Moore v. Asente*, 110 S.W.3d 336, 354 (Ky. 2003) (citations omitted). The trial court assesses the credibility of witnesses and determines the weight of evidence. *See, e.g., Barber v. Bradley*, 505 S.W.3d 749, 754 (Ky. 2016). Legal conclusions from a bench trial are reviewed *de novo. Id.*

Nannie's Estate initially addresses the issue of forgery, arguing the circuit court erred in finding Kerry did not forge the check. Because that finding is supported by substantial evidence, we disagree.

Both Kerry and Miller testified the signature on the check was Pat's. Although their stories conflicted as to the surrounding circumstances, both acknowledged Pat signed the check. The testimony of Blandford and Jaglowicz, disinterested FNB employees, was also significant. Both testified the signature on the check was similar to Pat's signature card. We do not ignore the testimony of a handwriting expert that it was her strong belief the signature on the check was not Pat's. However, the circuit court found this testimony not credible; this Court cannot assign more credibility to it merely because the witness testified with enthusiasm and conviction. *Commonwealth v. Jones*, 880 S.W.2d 544, 545 (Ky. 1994) (citation omitted) ("appellate court cannot reevaluate the evidence or substitute its judgment as to the credibility of a witness for that of the trial court"). We defer to the circuit court's credibility findings and, therefore, we are compelled

to find substantial evidence supports the conclusion that Pat's signature was not a forgery.

We also conclude Pat made an *inter vivos* gift of $38,500.00 to Kerry. Our Supreme Court has established the elements of an *inter vivos* gift as follows:

> (a) [t]hat there must be a competent donor; (b) an intention on his part to make the gift; (c) a donee capable to take it; (d) the gift must be complete, with nothing left undone; (e) the property must be delivered and go into effect at once, and (f) the gift must be irrevocable.

*Howell v. Herald*, 197 S.W.3d 505, 507 (Ky. 2006) (quoting *Gernert v. Liberty Nat'l Bank & Trust Co. of Louisville*, 284 Ky. 575, 145 S.W.2d 522, 525 (1940)). Because "gifts of this character [intervivos] [sic] furnish a ready means for the perpetration of fraud, the evidence necessary to establish all of the essentials to complete them must be clear and convincing." *Id*. at 507-08 (citation omitted).

We acknowledge that the circuit court could have given more detail in its discussion of the elements of an *inter vivos* gift. However, we find the facts found and inferences from the evidence as articulated in the order sufficient to affirm the court's decision. The court concluded "there was testimony that Pat intended to gift Kerry money from the account of which Nannie had removed herself years prior. As such, the court concludes the check written to Kerry was a gift to him from his father, Pat[.]"

-9-

Nannie's Estate's first point of contention is that the circuit court failed to apply the clear and convincing evidence standard. Although the circuit court did not explicitly express that standard, "judges and justices are presumed to know the law[.]" *Burton v. Foster Wheeler Corp.*, 72 S.W.3d 925, 930 (Ky. 2002). Because there is no indication the court applied the wrong standard, we presume it applied the right one.

Nannie's Estate then focuses its argument on the elements of an *inter vivos* gift, but challenges only three of the five elements – completeness, delivery, and irrevocability. We therefore limit our discussion to these three elements.[6]

The Kentucky Supreme Court in *Howell*, *supra*, noted under certain facts the elements of "completeness, delivery, and irrevocability are so interwoven that separate treatment of each would be repetitive." *Id*. at 508. And, in such circumstances, proper delivery may be dispositive of all three. *Id*. This is especially so in the context of a gift of money by means of a check.

---

[6] We note Nannie's Estate's argument in its brief that this was not a valid *inter vivos* gift alludes in passing to Pat's waning health and competency (element (a)) and his lack of intention to make a gift (element (b)), especially on the day Kerry presented the check to the bank. However, that argument does not specifically challenge the circuit court's explicit and inferential conclusions regarding Pat's competency or intention to make a gift. We consider those arguments thus waived regarding the challenge to the validity of the gift. On the other hand, Pat's intention in making the gift is at the very heart of Nannie's Estate's subsequent argument that his real intention was to defraud Nannie of her statutory spousal share of his estate. Therefore, we address the circuit court's factfinding regarding Pat's intention in the discussion of that latter argument.

-10-

*Inter vivos* gifts by check have slightly nuanced rules when it comes to delivery.  The check itself is not the gift.  Rather, a check is merely how the grantor memorializes the intent to convey the gift.  The gift is the money on deposit in a bank account.  *See Foxworthy v. Adams*, 136 Ky. 403, 124 S.W. 381, 382-83 (1910).  Accordingly, "the issuance and delivery of a check for the purpose of a gift is not a delivery of the money . . . ."  *Id.* at 383.  "The rule is that a gift of one's own check is incomplete until the check has been paid or accepted by the bank."  *Id.* at 382.

One consequence of that rule is that "[a] check, . . . when given without consideration, may be countermanded or revoked by the maker so long as it remains unacted on in the hands of the payee.  Until payment or acceptance there is not a complete delivery of the subject-matter such as is essential to constitute a valid gift."  *Id.* at 382-83 (citation omitted).  Another is that, "in the absence of such payment or acceptance, the death of the drawer [will] operate[] as a revocation of the check."  *Thogmorton v. Grigsby's Adm'r*, 124 Ky. 512, 99 S.W. 650, 651 (1907).

From these old, but valid, authorities, we can draw one conclusion – a gift in the form of a check becomes complete and irrevocable upon presentment and payment by the drawee.  As in *Howell*, *supra*, these facts present a situation where delivery is dispositive of the three contested elements.  Here, the check was

presented and honored by FNB on January 3, 2017, two days prior to Pat's death. At this point the gift was delivered, rendering it complete in the amount of $38,500.00 and irrevocable, satisfying the elements of an *inter vivos* gift.

We are cognizant of the concern raised by Nannie's Estate that the check, when given to Kerry, was not dated and did not list a payee or an amount. However, we find substantial evidence supports the circuit court's finding that Pat intended for Kerry to withdraw all of the money from his bank account. We particularly note the testimony of Blandford, the branch manager of FNB at all relevant times. She testified that Pat called approximately one month before giving the check to Kerry and inquired about making Kerry a joint account holder. He ultimately asked her, "I can write Kerry a check, right?" Coupled with Kerry's testimony that Pat told him to "take every dime he had because that is the only way you will ever get anything[,]" this is substantial evidence to support the circuit court's finding that Pat wanted Kerry to have the full amount in his bank account. Presentment of the check to the bank where it was honored establishes the elements of completeness, delivery, and irrevocability. The circuit court did not err in concluding the transfer was an *inter vivos* gift.

Nannie's Estate's next argument is that Pat's true intention when he gave Kerry the blank check was to defraud Nannie of her statutory spousal share of

-12-

his estate guaranteed by KRS[7] 392.020. Pursuant to that statute, a surviving spouse is entitled to "an absolute estate in one-half (1/2) of the surplus personalty left by the decedent." We begin by noting this legal truism – the circuit court's finding that Pat intended to make an *inter vivos* gift to Kerry cannot coexist with a finding that Pat intended to defraud Nannie. The former allows Kerry to keep the money, but the latter would require him to return it.

We also acknowledge that "dying spouses sometimes attempt to defeat the surviving spouse's statutory share by disposing of property prior to death through *inter vivos* transfer of assets to third parties [and s]uch attempts . . . are deemed fraudulent." *Bays v. Kiphart*, 486 S.W.3d 283, 287 (Ky. 2016). "The rule, stated simply (and traditionally), is that a man may not make a voluntary transfer of either his real or personal estate *with the intent* to prevent his wife, or intended wife, from sharing in such property at his death . . . ." *Id.* (emphasis added) (internal quotation marks and citation omitted). Indeed, "intent to defraud . . . *is a question of fact* . . . ." *Sims v. Commonwealth*, 260 S.W.2d 393, 394 (Ky. 1953) (emphasis added). Furthermore, "intent to defraud . . . may be inferred . . . from the attendant circumstances shown by the evidence . . . ." *Id.* (citation omitted).

---

[7] Kentucky Revised Statutes.

Although the circuit court addressed the relative persuasiveness of legal precedent,[8] it nevertheless retained its focus on factfinding.  The bulk of the evidence supports the finding that Pat intended to ensure his son was provided for after his death.  Pat first gave the blank check to Jeff Miller, a vendor Kerry used in his business, as collateral for any debt Kerry owed, or may owe in the future.  This is a certain demonstration of caring for his son.  Independently of that event, Pat contacted FNB as early as October 2016, expressing his desire to make Kerry a joint owner of his bank account.  Although this didn't come to fruition, it supports the inference Pat wanted Kerry to have unrestricted use, control of, and access to his bank account.  Lastly and significantly, Pat told Kerry, as he gave him the check, that this was "the only way you will ever get anything."  The reasonable inference to be drawn is that Pat, having made no will, feared Kerry would receive nothing upon his death.  Taken together, this is substantial evidence supporting the circuit court's finding that Pat's intention was not to defraud Nannie, but to make a valid *inter vivos* gift to his son.

## CONCLUSION

For the foregoing reasons, we affirm the findings of fact, conclusions of law, and order of the Marion Circuit Court.

---

[8] The circuit court said it was "most persuaded by" *Raichel v. Raichel*, 65 S.W.3d 497 (Ky. 2001).  We find that case inapposite.  However, that does not affect our conclusion that the circuit court's factfinding on the issue is supported by substantial evidence.

ALL CONCUR.


BRIEFS FOR APPELLANTS:        BRIEF FOR APPELLEES:

E. Gregory Goatley           Dawn L. McCauley
Springfield, Kentucky        Lebanon, Kentucky