RENDERED: FEBRUARY 24, 2022
TO BE PUBLISHED

# Supreme Court of Kentucky

2020-SC-0567-DG

MITZI SIMPSON AND KAREN HILL                      APPELLANT
AS CO-ADMINISTRATOR OF THE
NANNIE CATHERINE WETHINGTON
ESTATE


ON REVIEW FROM COURT OF APPEALS
V.                     NO. 2019-CA-0425
MARION CIRCUIT COURT NO. 17-CI-00071


KERRY T. WETHINGTON; AND                   APPELLEE
JEREMY WETHINGTON,
INDIVIDUALLY, AND AS
ADMINISTRATOR OF THE JAMES
PATRICK WETHINGTON ESTATE


**OPINION OF THE COURT BY JUSTICE CONLEY**

**REVERSING AND REMANDING**

This case is before the Court on appeal by Mitzi Simpson and Karen Hill, as Co-Administrator of the Nannie Wethington Estate, the Appellant, from the opinion of the Court of Appeals affirming the Marion Circuit Court. After a bench trial, the circuit court declared the Estate of Nannie Wethington had no dower right, pursuant to KRS[1] 392.020, in $38,500 withdrawn from the bank

---

[1] Kentucky Revised Statutes.

account of her husband, James Wethington, by their son, Kerry Wethington, two days prior to James' death.[2]

The Court of Appeals agreed the $38,500 was a valid *inter vivos* gift from James to Kerry thereby defeating the dower rights of Nannie. Nannie appealed and we granted discretionary review. After review of the record and appropriate case law, we conclude the lower courts failed to apply controlling precedent. We reverse the Court of Appeals, and the circuit court's judgment is vacated in part. Nannie's Estate is entitled to recoup her dower pursuant to KRS 392.020.

## I. Facts and Procedural Background

The trial court described the procedural history of this case as "chaos" and "dysfunctional." No claim of procedural impropriety is raised before us though, so we will restrict our account to the facts underlying the litigation.

James and Nannie were married in July of 1990. They remained married until James passed away on January 5, 2017. He died intestate. His heirs at law are his sons, Kerry, Jeremy Wethington, James Mills, and a daughter, Valerie Wethington. Nannie passed away on September 6, 2017. She died intestate. Her heirs at law are Karen Hill, Mitzi Simpson, and Travis Godbey.

Sometime in October 2015, James signed a blank check and delivered it to Jeff Miller as collateral for money owed to Miller by Kerry related to a fencing business. Miller eventually placed a lien on some of Kerry's real property and no longer needed the check. The trial court found Miller returned the signed,

---

[2] Because the parties are representatives of estates and the son of the decedents, we will refer to the estates by the first name of their respective decedent and to Kerry by his first name as well.

blank check to James within a year of October 2015. Although some details differed, both Kerry and Miller testified to witnessing James sign the check.

On November 30, 2016, Kerry drove his father to the Veterans Administration hospital as James was battling a serious illness. During the trip, Kerry testified, his father handed him the signed, blank check. For clarity, we quote from the cross examination:

Counsel: And he told you to write the check for $38,500?

Kerry: He didn't tell me the exact amount, no. He told me to fill it out and take every dime he had. That's the only way we was [sic] going to get anything.

Later, the court noted the check was backdated to November 30, 2016, but was not presented to the bank for deposit until January 3, 2017. The court asked Kerry to explain the backdating. Kerry answered, "He [James] said date it for today [November 30] and take every dime I've got. That's the only way you're going to get anything." The court then inquired:

Court: Why did you wait five weeks to fill out the check and cash it?

Kerry: I done what he told me to do.

Court: Which was?

Kerry: Wait until anything ever happened to him, whenever they started stealing and taking stuff, to take the check to the bank and take every dime he had, that's the only way we's [sic] going to get anything.

Finally, the court clarified with Kerry that when he deposited the check on January 3, 2017, he did so in contemplation that his dad was going to die or was near death. Kerry affirmed he did not believe his dad would ever leave the hospital the day he cashed the check. The court then asked Kerry if when

3

he cashed the check it was his intent to ensure Nannie did not receive her portion of the $38,500 should it have passed to James' estate. Kerry said it was not his intent to do that.

The circuit court found Kerry to be a credible witness. It determined Kerry had not forged James' signature on the check but rather James made a valid *inter vivos* gift to Kerry. It determined James had expressed a desire before his death to give Kerry access to the bank account—and even inquired about putting his name on the account but found the effort prohibitive due to illness—and the signing of blank check was merely a means to accomplish this desire.

One fact that is crucial in our analysis is the trial court's finding that "Nannie, upon being appointed Administratirx of [James'] estate, filed an Inventory and Appraisement of the Estate on January 23, 2017, claiming he had total assets of $35,000, not including any mention of cash or accounts . . ." Thus, it would appear Nannie failed to mention the bank account containing $38,500. Nonetheless, taking the appraisement of the estate as true, and we have no evidence to suggest it is not, $38,500 represents more than half the total cash value of James' estate at the time of his death. The significance of this fact will be elucidated in Section III below.

From the $38,500, Kerry testified he spent $5,000 to fund purchases of fences for his business dealings. He also loaned $8,500 to his brother, Jeff Wethington, that has since been paid back to Kerry in cash. Additionally, a summary judgment award of costs and fees totaling $3,643 was granted to

4

First National Bank which administered the account. This would bring the sum of the account to $21,357, but the trial court states the current figure stands at $22,392.77. This discrepancy is ultimately irrelevant to our disposition, but we proceed assuming the latter figure is accurate. The funds are being held in escrow by the Marion Circuit Clerk.

On appeal, the Court of Appeals affirmed the trial court's conclusion that Kerry had not forged James' signature on the check, as supported by substantial evidence. Secondly, the Court of Appeals considered the question of *inter vivos* gift. It held the legal elements were satisfied and that a gift of $38,500 was made by James to Kerry on January 3, 2017, pursuant to *Howell v. Herald*, 197 S.W.3d 505, 507 (Ky. 2006), and *Foxworthy v. Adams*, 124 S.W. 381, 382-83 (Ky. 1910). Finding the gift valid, it affirmed the trial court.

Finally, the Court of Appeals affirmed James intended to give Kerry the money to ensure he would receive a portion of his property upon his death. Specifically saying, "Lastly and significantly, [James] told Kerry, as he gave him the check, that this was 'the only way you will ever get anything.' The reasonable inference to be drawn is that [James], having made no will, feared Kerry would receive nothing upon his death."

Further facts will be developed in our analysis as necessary. We now address the merits of the appeal.

## II. Standard of Review

This is an appeal from a bench trial. The factual findings of the trial court will not be set aside unless clearly erroneous. CR[3] 52.01. Although we grant a high degree of deference to factual findings, "appellate review of legal determinations and conclusions from a bench trial is *de novo.*" *Barber v. Bradley*, 505 S.W.3d 749, 754 (Ky. 2016).

## III. Analysis

### A. The Rule Against Fraudulent Deprivation of Dower

A widow[4] has an absolute estate to one-half of the personalty of her deceased husband's estate. KRS 392.020. To protect that right, the rule against fraudulent deprivation of dower developed. It is well-settled and of long duration. We quote at length from the leading cases. In *Murray v. Murray*, the court stated:

> If the advancements or gifts be reasonable, when considered with reference to the amount of property owned by the husband, and his purpose be to provide for the children, and not to defraud the wife, then she cannot complain, although they in fact diminish the property to which her inchoate rights have attached by the marriage. It is a question of intention upon the part of the grantor. If the property given away constitute all, or the principal part, of the husband's estate, and be such an advancement as is unreasonable, when compared with his entire property, then, while it should not be conclusively presumed to have been made in fraud of the wife's marital rights, yet *prima facie* it should be so regarded, and the *onus* of showing otherwise be cast upon the donee. Each case must depend upon its own circumstances.

---

[3] Kentucky Civil Rules of Procedure.

[4] The facts of the case justify using the gendered language of "widow" and "dower." Importantly though, KRS 392.020 has abolished the sexual distinction between dower and curtesy at common law. The portion of the inheritance and rules regulating the right are now uniform between spouses.

13 S.W. 244, 246 (Ky. 1890). Courts must consider "the amount of the husband's estate, the value of the advancements, the time within which they are made, and all other *indicia* which will serve to determine the intention accompanying the transaction." *Id.* In another case, the court held:

> The right of the father to give to his children money, choses in action, as well as goods and chattels, during the life of the wife, or the existence of the marital relation, cannot be questioned; but, when such a gift is made with and for the purpose of defrauding the wife, it will be set aside to the extent it may affect her rights as widow.

*Manikee's Adm'x v. Beard*, 2 S.W. 545, 546 (Ky. 1887). Finally, in the third leading case, the rule was stated,

> while the wife cannot complain of reasonable gifts or advancements by a husband to his children by a former marriage, yet, if the gifts constitute the principal part of the husband's estate and be made without the wife's knowledge, a presumption of fraud arises, and it rests upon the beneficiaries to explain away that presumption; and in judging of the good faith of the transaction the court must look to the condition of the parties and all the attending circumstances.

*Payne v. Tatem*, 33 S.W.2d 2, 3 (Ky. 1930). We have recently reiterated this rule, and in so doing made clear when a spouse attempts to defeat dower rights through *inter vivos* gifts, "rather than constituting bona fide gifts, [they] are deemed fraudulent. And this Court and its predecessor have repeatedly stated that such attempts are improper and may be unwound, at least to the extent needed to fund the surviving spouse's share." *Bays v. Kiphart*, 486 S.W.3d 283, 287 (Ky. 2016).

7

In *Murray*, a father made certain gifts and assignments to his sons of stocks, debts, and bonds, both before and after his marriage to his third wife. *Murrary*, 13 S.W. at 245-46. The court overturned those gifts to the extent of $10,000 which it determined was her dower portion. *Id.* at 246. In *Beard*, a husband gifted approximately $2,500 to his daughter by a first marriage with the stated purpose of ensuring his wife would not control any portion of it. *Beard*, 2 S.W. at 545. The court explained when "in the last illness of the husband, he makes a secret gift of all his money and cash notes to his daughter, not retaining enough in his own possession to provide him with the comforts of life . . ." the gift could not stand and ordered the widow receive her just portion. *Id.* at 546. In *Payne*, a husband had given his daughter from a prior marriage a certificate of deposit of $4,000 two years before his death. The court noted the father was "not only very devoted to her, but looked up to her and consulted her about all his affairs . . ." *Payne*, 33 S.W.2d at 3. But despite being "unusually devoted to his daughter[,]" the court did not allow that to overcome the presumption of fraud in light of the fact that at the time of the gift of $4,000, the husband had an estate worth only $4,660. *Id.* Thus, the court held the "gift invalid to the extent of the wife's distributive share thereof." *Id.*

### B. The Nature of the Dower Right

To avoid the operation of this rule, Kerry has argued dower rights are a mere legislative creation thus, this Court may not add what is not found in the statute nor derogate from its plain terms. In other words, he contends the rule

against fraudulent deprivation of dower is akin to judicial legislation or has otherwise been abolished by the General Assembly omitting it from KRS 392.020. Additionally, he contends the very act of gifting the $38,500 removed the money from James' property thus, Nannie has no claim upon it. History, law, and reason, however, militate against his position.

Reason dictates if the law forbids a husband from secretly gifting his property for the purposes of defeating his wife's dower rights, then he may not avoid the consequences of that law by doing the very thing it forbids. Kerry surely understands this, hence his argument the rule against fraudulent deprivation is not justified by the statute itself. That argument fails to consider the interaction between statutory law and common law.

The common law is operative in the Commonwealth until a particular rule is repealed by statute or determined repugnant to the constitution itself. Ky. Const. § 233. When the General Assembly undertakes to abolish the common law, "the intention to abrogate the common law is not presumed. The intention to repeal must be clearly apparent." *Ruby Lumber Co. v. K.V. Johnson Co.*, 187 S.W.2d 449, 453 (Ky. 1945). Moreover, "[a] statute does not impliedly repeal the common law where they are not inconsistent and both can stand." *Commonwealth v. Barnett*, 245 S.W. 874, 878 (Ky. 1922) (internal quotation and citation omitted). "It is a maxim of the common law that a statute made in the affirmative, without any negative, express or implied, does not take away the common law." *Id.* at 877 (internal quotation and citation omitted).

9

In this instance, not a word in KRS 392.020 even hints at an intent by the General Assembly to abolish the rule against fraudulent deprivation of dower. It is also obvious the rule supports the purpose of that statute rather than denigrates it, as will be demonstrated.

To appreciate the salutary nature of the rule against fraudulent deprivation of dower, one must consider the dower right itself. Sir Edward Coke identified the "ancient lawe of England" prior to the Norman Conquest in 1066 as requiring the widow to remain in her husband's house for a year and within that time, if she was not assigned her dower, she could demand it via writ. Sir Edward Coke, The First Part of the Institutes of the Laws of England, 32 b. (The Lawbook Exchange, Ltd. 2015) (1823). Roughly 150 years post-Conquest, the Magna Carta—the fount of Anglo-American constitutional law—was issued in an effort to stave off civil war. It specifically enumerates and protects the right of a widow's dower. *Magna Carta* § 7. In short, the dower right itself is of ancient origin. To say it is merely a statutory creature grossly undervalues its historical pedigree.

In his notes on Blackstone, St. George Tucker comments the dower right is one buttressed by the trifecta of moral law, common law, and equity. 3 Tucker's Blackstone 129 n.12 (St. George Tucker ed., The Lawbook Exchange, Ltd. 2011) (1803). Such is its nature that if the husband should fail in his moral duty, the law will compel him, though dead, to fulfill it. If the law should fail, equity will step in to deliver unto the widow that which she has a right to possess. And so, it is that we find a court of equity first applying the rule

10

against fraudulent deprivation in 1673. *Howard v. Hooker,* 2 Chan. Rep. 81, 21 Eng. Rep. R. 622 (1672-3).

Thus, there has never been a time in the history of Kentucky when the dower right has been unknown, or its fraudulent deprivation provided against. Ky. Const. Art. VIII, § 6 (1792). In 1894, the right was codified as Ky. St. 2132. *Brand's Ex'r v. Brand,* 60 S.W. 704, 704-05 (Ky. 1901). Its recodification in 1942 as KRS 392.020 was simply part of the general revision of our statutes, nothing more.

**C. The Gift of $38,500 was Presumptively Fraudulent and Evidence Conclusively Proves the Presumption**

As noted in Section I, the appraisement of James' Estate is $35,000. Combined with the $38,500 from the bank account, the latter constitutes 52% of James' estate. On this fact alone, the trial court should have presumed the gift was fraudulent and obliged Kerry to overcome the presumption with evidence. *Harris v. Rock,* 799 S.W.2d 10, 11 (Ky. 1990); *Payne,* 33 S.W.2d at 3; *Murray,* 13 S.W. at 246. But it is unnecessary to remand back to the circuit court for further fact finding. The circumstances of the gift, as well as Kerry's own testimony, do not overcome the presumption; in fact, they support it.

The gift itself was completed on January 3, 2017, a mere two days prior to James' death. The check was first handed to Kerry on November 30, 2016, and his testimony is clear his father instructed him not to cash the check until something happened to him and the rest of the family began "stealing" the money. This instruction does not make sense except in reference to James'

11

eventual demise, and Kerry's actions confirm that inference. He waited to cash the check for five weeks until his father was in the hospital, on life support, and he believed he would soon die. The gift therefore was made in *causa mortis*. *Martin v. Martin*, 138 S.W.2d 509, 514 (Ky. 1940) (noting "a gift causa mortis by a husband to a third person is a fraud on the wife's marital rights, where the gift is made to prevent her sharing in the property, since the gift does not take effect until the death of the donor.") Moreover, although James clearly expressed his desire that Kerry should have the money, Kerry also testified James' desire was no one else in the family should have it—they would "steal" or "take" it. The evidence shows that Nannie was the only other person drawing on the account. James' other children could not possibly have accessed the money except through distribution in probate. Thus, James either intended to prevent Nannie from continuing to use the funds after his death or intended to prevent her and his other children from receiving a share of the money in probate.[5] In either case, the gift cannot be said to be purely beneficent but was also calculated to deprive his wife and other children of any share.

Nannie herself was unaware that the gift had been made. Mitzi Simpson testified Nannie continued to write checks upon the account after January 3, 2017 and did not realize the account had been depleted of funds until her checks started bouncing. Nothing in the circuit court's findings of fact contradict this. Kerry affirmed he had not told any other person about his father giving him the check and his concomitant instructions. Although the

---

[5] At risk of stating the obvious, these are not mutually exclusive intentions.

trial court was perplexed as to why the account was not listed on the Appraisement of James' Estate, that is irrelevant. It cited no authority, nor can we find any, to support the proposition that failure to list personalty on an appraisement of an estate bars an action to recover dower.

With these facts in mind, this case is similar to *Beard*, when the court held,

> where the husband makes known his purpose to dispose of his money, choses in action, etc., with the design to defraud the wife, and in his last illness, in the absence of his wife, and in contemplation of death, gives the control of his personalty, including his money, choses in action, etc., to his children, the chancellor will not long hesitate in restoring to the widow the rights of which she has been fraudulently deprived.

*Beard*, 2 S.W. at 546.

Finally, the trial court investigated whether Kerry intended to deprive Nannie of her dower when he deposited the check. He testified he did not. That too is irrelevant. As stated in *Murray,* the question of intent pertains to the donor, not the donee. *Murray,* 13 S.W. at 246. Moreover, in *Murray* the sons who received the gifts testified "doubtless honest in the belief . . . that they [the gifts] were *bona fide,* and made without any intention to defraud the appellant as to her inchoate rights in the estate of her husband." Still that did not prevent the court from ordering the widow receive her dower. *Id.* Similarly, the fact that Kerry thought he was receiving a genuine gift and had no intention on his part to deprive Nannie of her dower cannot overcome her right to it. The gift is presumptively fraudulent and nothing in the facts as the circuit court found them to be overcomes the presumption.

**D. Determining the Remedy**

Having concluded the gift is fraudulent, it remains to determine the remedy. Although the bank account currently stands at $22,392.77, that is not the correct figure to determine Nannie's portion. Instead, we look to the amount of the personalty fraudulently conveyed at the time of the gift, i.e., the full $38,500. Although one might reasonably conclude the entire gift should be reversed with any residue passing to James' estate, that is in fact not the rule. In *Bays v. Kiphart*, it was stated the fraudulent *inter vivos* gifts "may be unwound, at least to the extent needed to fund the surviving spouse's share." 486 S.W.3d 283, 287 (Ky. 2016). In *Bays*, we did not order any redistribution because we determined life insurance proceeds were not personalty that passed to the estate of the decedent. *Id.* at 288-90. But in several other cases across the centuries this rule has been clearly followed. For example, in *Beard*, the court concluded of the $2,500 fraudulently conveyed by the deceased husband, the widow "was entitled to one-third of this money and the cash notes, and the appellee must account for it." 2 S.W. 545, 546 (Ky. 1887). In *Murray*, the court determined the husband had given his sons approximately $34,000 of personalty in deprivation of his widow's rights thus, "[a]llowing for reasonable advancements to the children, the wife was, in our opinion, entitled to $10,000 as her distributable portion of the estate. This, it seems to us, is the equity of the case." 13 S.W. 244, 246 (Ky. 1890). In *Payne*, the court concluded "the chancellor should have adjudged the gift invalid to the extent of the wife's distributive share thereof." 33 S.W.2d 2, 3 (1930). In *Rowe v. Ratliff*, a husband

14

fraudulently conveyed title to the land he and his wife lived upon to his mother. The court declared the deed "so far as it might operate to deprive her of her dower in the land therein embraced is inoperative and void." 104 S.W.2d 437, 440 (Ky. 1937). It then ordered that her dower portion be ascertained on remand and distributed to her. *Id.*

We, therefore, conclude Nannie's estate is entitled to recoup from the gift only that portion which would make her whole up to the 50% of the personal estate she is entitled to (excluding her $15,000 statutory set-off). We remand to the trial court for further fact finding to determine what this amount should be, as we have no fact-finding as to the distribution of the rest of James' estate in probate. We note, however, if the probate court is waiting for resolution of this case, then the circuit court should order the Marion Circuit Clerk to distribute $19,250 from the amount held in escrow. The probate court would then be responsible for ensuring the distribution of the rest of James' personal estate to Nannie's estate would not exceed her 50% share.

### IV. Conclusion

James Wethington made a gift of $38,500 to his son, Kerry Wethington. This gift was *in causa mortis*, without his wife's knowledge, and was intended to deprive her and his other children of any portion of the money. KRS 392.020 commands a widow is entitled to one half the personalty of her husband's estate. Because the $38,500, combined with the rest of James' estate, constituted 52% of his estate, and the gift was made without his wife's knowledge, the trial court should have presumed the gift was fraudulent and

15

put the burden on Kerry to show it was a reasonable and bona fide gift, in light of all the circumstances. The trial court failed to do this, and the Court of Appeals erred in affirming. Since our application of the law is *de novo,* we have applied the presumption and accepting the facts as the trial court found them to be, conclude the gift was fraudulent.

We therefore reverse the Court of Appeals. We vacate the portion of the trial court's Judgment insofar as it ordered the remaining $22,392.77 be paid to Kerry Wethington. We remand to the Marion Circuit Court with instructions that Nannie Wethington's Estate be distributed that amount of the gift held in escrow which would satisfy her 50% statutory share.

All sitting. All concur.


COUNSEL FOR APPELLANT:

E. Gregory Goatley

COUNSEL FOR APPELLEE:

Dawn L. McCauley